The **SANDUSKY COUNTY Democratic Party, et al., Plaintiff**

v.

**J. Kenneth BLACKWELL, Defendant**

No. 3:04CV7582.

United States District Court,
N.D. Ohio,
Western Division.

Oct. 14, 2004.

Fritz Byers, Michael P. O'Grady, Richard M. Kerger, Kerger & Kerger, Toledo, OH, Rory P. Callahan, Cloppert Latanick Sauter & Washburn, Columbus, OH, Joseph V. McNamara, Cooper & Walinski, Richard S. Walinski, Cooper & Walinski, Joseph J. Allotta, Allotta, Farley & Widman, Toledo, OH, for The Sandusky County Democratic Party, The Ohio Democratic Party, Farm Labor Organizing Committee, Inc., North Central Ohio Building and Construction Trades Council, Local 245 International Brotherhood of Electrical Workers, Plaintiffs.

Richard G. Lillie, Benesch Friedlander Coplan & Aronoff, Cleveland, OH, for J. Kenneth Blackwell, in his Official capacity as Secretary of State, Defendant.

James P. Silk, Jr., Spengler Nathanson, Theodore M. Rowen, Spengler Nathanson, Truman A. Greenwood, Spengler Nathanson, Toledo, OH, for Gregory L. Arnold, Glenn A. Wolfe, Thomas W. Noe, Intervenors.

## ORDER

CARR, District Judge.

This is a suit under 42 U.S.C. § 1983 to enforce provisions of the Help America Vote Act, Pub.L. 107–252, Title III, § 302, 116 Stat. 1706 (codified at 42 U.S.C. § 15301, et seq.) (HAVA). Plaintiffs are the Ohio Democratic Party, the Sandusky County, Ohio, Democratic Party, and three labor organizations, all of whom sue as associational representatives of their members. The defendant is J. Kenneth Blackwell, Ohio Secretary of State.

Pending is plaintiffs' motion for a preliminary injunction and defendant's motion to dismiss. In addition, three individuals, who have been granted leave to intervene, have also filed a motion to dismiss.

For the reasons that follow, the motions to dismiss shall be overruled. Plaintiffs' motion for a preliminary injunction shall be granted.

### Background

Plaintiffs contend that HAVA, which was adopted on October 29, 2002, expanded the right of registered voters to cast a "provisional" ballot in federal elections. Among the statute's purposes, plaintiffs contend, is to ensure that electors whose names do not appear on the registration rolls at the polling place at which they appear or whose eligibility is challenged can vote provisionally: i.e., they can vote conditioned on a subsequent determination

that they are eligible to vote. Once that determination is made, their votes will be counted.

Section 15482(a) of HAVA, which delineates the requirements for provisional voting, states in pertinent part:

If an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot as follows:

(1) An election official at the polling place shall notify the individual that the individual may cast a provisional ballot in that election.

(2) The individual shall be permitted to cast a provisional ballot at that polling place upon the execution of a written affirmation by the individual before an election official at the polling place stating that the individual is-

(A) a registered voter in the jurisdiction in which the individual desires to vote; and

(B) eligible to vote in that election.

(3) An election official at the polling place shall transmit the ballot cast by the individual or the voter information contained in the written affirmation executed by the individual under paragraph (2) to an appropriate State or local election official for prompt verification under paragraph (4).

(4) If the appropriate State or local election official to whom the ballot or voter information is transmitted under paragraph (3) determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law.

(5) (A) At the time that an individual casts a provisional ballot, the appropriate State or local election official shall give the individual written information that states that any individual who casts a provisional ballot will be able to ascertain under the system established under subparagraph (B) whether the vote was counted, and, if the vote was not counted, the reason that the vote was not counted.

(B) The appropriate State or local election official shall establish a free access system (such as a toll-free telephone number or an Internet website) that any individual who casts a provisional ballot may access to discover whether the vote of that individual was counted, and, if the vote was not counted, the reason that the vote was not counted.

42 U.S.C. § 15482(a).

Section 15484 of HAVA states that the statute's requirements "are minimum requirements." The statute permits states to deviate from its provisions, provided that such deviation is "more strict than the requirements established under" HAVA and is "not inconsistent with the Federal requirements" mandated by HAVA. Thus, to the extent that Ohio does not conform to HAVA, its provisions must be more strict (i.e., go further to protect the franchise) than HAVA, and not inconsistent with the statute's requirements.

Congress anticipated that the provisional voting provisions of § 15482(a) of HAVA, which by its own terms applies solely to procedures relating to elections for federal office, were to be in place before the November, 2002, federal election. H.R. Rep No. 107–329(I), § 504(b). If

that deadline were not met, due to a certification of the chief election official that good cause existed to delay the provision's implementation, the deadline is the November, 2004, federal election.

Ohio's Chief Election Official, defendant Blackwell, published Ohio's HAVA State Plan in June, 2003 (State Plan), 69 Fed. Reg. 14879 (March 24, 2004). In the Plan, Blackwell stated that he would "continue to refine and expand the scope of provisional voting in the state to comply with the spirit, intent and letter" of HAVA. *Id.* at 14895. He acknowledged that prior to HAVA, federal law protected "those who changed their residence." He asked, "what about those who, for example, were incorrectly purged from the voter registration list?" *Id.*

The answer to that question is found in HAVA, as the statute's formal legislative history makes clear. House Report 107–329(I), *supra*, in its discussion of the minimum standards that states must meet under HAVA, lists, among several other reasons for the statute's enactment, improper purging of qualified electors as one of the circumstances giving rise to HAVA.

Despite Blackwell's assurance in the State Plan that he "embrac[ed] the concept" of "accommodat[ing] every voter who, for whatever reason, does not appear on the certified list of registered voters in any jurisdiction of the state," *id.* at 34, he did not issued any regulations or directives relating to provisional voting in light of HAVA until September 16, 2004.

On that date, Blackwell issued *Ohio Secretary of State Directive 2004–33* (Directive 2004–03), addressed to all Ohio County Boards of Elections. Directive 2004–33 states:

### Issuing And Processing Provisional Ballots

All boards of elections must instruct their pollworkers on the provisional voting procedures authorized by state and federal law.

**State Law: Provisional voting eligibility based on elector moving from one Ohio precinct to another.**

Ohio law provides that every United States citizen who is of the age of 18 years or over and who has been a resident of the state 30 days immediately preceding the election at which the citizen offers to vote, is a resident of the county and precinct in which the citizen offers to vote, and has been registered to vote for 30 days, has the qualifications of an elector and may vote at all elections in the precinct in which the citizen resides. R.C. 3503.01.

State law further provides that an eligible elector who moves from one Ohio precinct to another before an election may, in accordance with the procedures set forth in R.C. 3503.16, update his or her existing voter registration to the new voting residence address and vote a provisional ballot for the precinct in which the person's new voting residence is located. The provisional ballot will be counted in the official canvass if the county board of elections confirms that the person was timely registered to vote in another Ohio precinct, and that the person did not vote or attempt to vote in that election using the person's former voting residence address.

Because R.C. 3599.12 specifically prohibits anyone from voting or attempting to vote in any election in a precinct in which that person is not a legally qualified elector, pollworkers in a precinct must confirm before issuing a provisional ballot that the person to whom the provisional ballot will be issued is a resident of the precinct, or portion of the precinct, in which the person desires to vote.

In order for that confirmation process to work, the boards of elections must include with the supplies for each precinct a complete and correct map of, and street listing for, that precinct. Both the map and street listing must clearly indicate any splits within the precinct. Before issuing a provisional ballot as provided for under state or federal law, the pollworkers must confirm that the voting residence address claimed by the voter is located within the area shown on the precinct map and listed on the street listing.

Only after the precinct pollworkers have confirmed that the person is eligible to vote in that precinct shall the pollworkers issue a provisional ballot to that person. Under no circumstances shall precinct pollworkers issue a provisional ballot to a person whose address is not located in the precinct, or portion of the precinct, in which the person desire to vote. However, no provisional ballot will be disallowed because of pollworker error in a split precinct.

If the pollworkers determine that the address of a person who desires to vote in a particular location is not located within that precinct, the pollworkers must contact the board of elections, and the board shall advise both:

1. The precinct in which the voter's address is located, and

2. The location of the polling place for that precinct.

(Doc. 1, Exh. A).

Although Directive 2004–33 tells its recipients that all "boards of elections must instruct their pollworkers on the provisional voting procedures authorized by state and *federal* law" (emphasis added), it does not refer to, describe, or discuss HAVA or any other provision of federal law. At most, the Directive hints in passing that federal law may affect the handling of provisional ballots: "Before issuing a provisional ballot as provided for under state or *federal* law, the pollworkers must confirm that the voting residence address claimed by the voter is located within the area shown on the precinct map and listed on the street listing." (emphasis added). There are no other references to federal law in Directive 2004–33.

Directive 2004–33, with its citation and discussion only of provisions of Ohio's election law, cannot fairly be read as telling Ohio county election officials how to apply HAVA in any of the following situations, which House Report 107–329(I), *supra*, described as among the "at least eight" reasons an elector's name may not be on the list of qualified voters:

1. Voters may be turned away because of administrative errors. Poll workers may overlook their names or not match them up with a different spelling. In most jurisdictions, poll workers work from printed lists of voters produced for each precinct. Staff in the offices that produce these lists can make clerical errors.

2. Poll workers may overlook a voter's name on the precinct roster, or may not be aware that the voter is listed on a supplemental roster containing the names of voters who registered shortly before the election.

3. Voters may have their names improperly removed from the voting rolls.

4. Voters may appear at the wrong precinct because they did not receive, or received but did not heed, a notice that their polling place had moved.

5. Motor-vehicle departments or social-service agencies that are supposed to make registration applications available to clients may improperly handle the applications or fail to forward them to

proper election officials in a timely manner.

6. Voters may fail to notify their registrar, or fail to re-register, after a change of address.

7. Well-intentioned organizations seeking to register voters may mishandle registration materials.

8. Otherwise qualified citizens may simply fail to register.[1]

H.R. Rep. 107–329(I), *supra*.

The plaintiffs allege that Directive 2004–33 fails to respond to the requirements of HAVA in that the Directive impermissibly:

1) limits provisional voting to persons who have moved from one precinct to another, rather than covering all registered voters whose names, for whatever reason, are not on the rolls;

2) withholds a provisional ballot from a voter who has gone to or attempted to vote at another precinct;

3) fails to require notification to unlisted voters of the right to vote provisionally; and

4) requires verification of eligibility at the polling place on the day of the election, rather than allowing county officials to confirm eligibility later.

Plaintiffs seek an injunction enjoining the defendant from applying the provisions of Directive 2004–33 that violate HAVA, and requiring prompt issuance of a new directive instructing county election boards to issue and count provisional ballots in accordance with HAVA.

In his opposition to the plaintiffs' motion for a preliminary injunction and motion to dismiss, Blackwell claims that:

1) there is no individual right of action under either HAVA or to enforce HAVA via § 1983;

2) plaintiffs lack standing to enforce any individual right that might arise under HAVA;

3) plaintiffs' suit is untimely;

4) Directive 2004–33 conforms to the requirements of HAVA; and,

5) plaintiffs are not entitled to injunctive relief.

For the reasons that follow, I conclude that HAVA creates individual rights enforceable through § 1983, plaintiffs have standing to enforce those rights, and Directive 2004–33 conflicts with HAVA. I also conclude that injunctive relief to accomplish compliance with HAVA is necessary.

### Discussion

### A. HAVA Creates Rights Enforceable Through § 1983

Plaintiffs assert that they can bring a claim under § 1983 to enforce individual rights created by HAVA. Defendants counter that HAVA creates no such rights, but merely directs state officials on how to conduct elections.

■ Only "unambiguously conferred" rights will support a § 1983 action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). "Section 1983 provides a remedy only for the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States," and, therefore, "it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id.*

In *Blessing v. Freestone*, 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569

---

1. The list does not include the one situation addressed in Directive 2004–33 (the elector who has moved).

(1997), the Supreme Court set out three factors that guide the inquiry into whether Congress intended to create a right:

First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* (citations omitted).

■ If plaintiffs show that the statute creates a right, the right is presumptively enforceable under § 1983. *Gonzaga, supra,* 536 U.S. at 284, 122 S.Ct. 2268. The burden is on the defendant to rebut this presumption. *Id.* at 285 n. 4, 122 S.Ct. 2268. Plaintiffs "do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Id.*

### 1. HAVA Establishes a Right to Vote Provisionally in Federal Elections

■ When determining whether Congress created a private right, I must look for the presence of "rights creating language" within the statute. *Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). This inquiry involves, *inter alia,* looking at the "focus" of the statute: namely, whether it "focus[es] on the person regulated rather than the individuals protected." *Id.*

■ In its Preamble, HAVA suggests that its focus will be on the administration of federal elections and federal election laws, rather than on the persons—individual electors—who would benefit from better administration of those laws. That Preamble states that Congress intends:

To establish a program to provide funds to States to replace punch card voting systems, to establish the Election Assistance Commission to assist in the administration of Federal elections and to otherwise provide assistance with the administration of certain Federal election laws and programs, to establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and for other purposes.

Help America Vote Act of 2002, Pub.L. No. 107–252, 116 Stat. 1666 (codified at 42 U.S.C. §§ 15301 et seq.).

When the topic is provisional voting, the text of HAVA speaks, however, in terms of "rights." Thus, the statute states that "voting information," as defined in the statute, "*shall*" be "publicly posted at each polling place." Such "voting information" is described as "general information on *voting rights* under applicable Federal and State laws, including information on the *right of an individual to cast a provisional ballot* and instructions on how to contact the appropriate officials if *these rights* are alleged to have been violated." 42 U.S.C. § 15482(b)(2)(e) (emphasis added).

Furthermore, HAVA repeatedly phrases its requirements in ways that can only be understood as unambiguously creating and securing individual rights. Section 15482(a)(2) states, for example, "The individual *shall be permitted* to cast a provisional ballot. . . ." [2] Such language can only

---

**2.** This language is similar to the rights creating language in both Title VI and Title IX—

"No person in the United States shall ... be subjected to discrimination;" and "No person

be read as providing voters with a mandatory, distinct, and recognizable right; the sort of right which meets all three requirements of the *Blessing* test. This rights creating language is, moreover, sufficiently unambiguous to satisfy *Gonzaga.*[3]

The legislative history of HAVA supports the conclusion that HAVA creates a private right. Throughout the floor debates, from HAVA's introduction until its passage, Congress made it clear that it desired to secure the rights of voters: as stated by Senator Dodd, a principal sponsor of HAVA, the intent is "to broaden the franchise of American citizens." 148 Cong. Rec. S709 (daily ed. Feb. 13, 2002) (statement of Sen. Dodd). Senator Bond observed that HAVA was enacted to *"make it easier to vote* and tougher to cheat." 149 Cong. Rec. S10,488 (Oct. 16, 2002) (statement of Sen. Bond) (emphasis added). In referring to provisional voting rights, Senator Bond also stated, "I also want to clarify the intent of the authors as to the extent and limit of the *right* conferred on the voter by this section." 148 Cong. Rec. S10488 (daily ed. Oct. 16, 2002) (Statement of Sen. Bond) (emphasis added).

Similarly, Senator Durbin described the "rights" created by HAVA:

> It requires that all states allow voters to cast a provisional ballot at their chosen polling place if the voter's name isn't on the list of eligible voters, or an election official, for whatever reason, declares a voter ineligible. Included in the *right to vote provisionally* is the *right* to have one's eligibility to vote promptly verified by the State and then to have one's

ballot counted in that election, according to State law. Finally, provisional voters have the right to know whether their vote was in fact counted, and if not, why it wasn't. These measures seem dictated by common sense and fairness. Yet, many States, including Illinois, do not guarantee voters such *rights* today.

*Id.* (Statement of Sen. Durbin) (emphasis added).

To be sure, HAVA's preamble and some portions of the statute itself, as defendant points out, are addressed to election officials, and regulate their conduct. But the statute goes beyond mere administration when it established its broad, unambiguous provisional voting mandate. That mandate makes the ability to vote provisionally possible where previously such right was limited, if available at all. In doing so, HAVA gave every otherwise eligible voter an unqualified right to vote provisionally whenever a voter believes his or her name improperly does not appear on the registration roll.

When it considered and adopted HAVA's provisional voting provisions, Congress understood what it was doing and why it was doing it: "The Committee believes provisional voting is necessary to the administration of a fair, democratic, and effective election system, and represents the ultimate safeguard to ensuring a person's right to vote. For these reasons, the Committee has included it in the bill." House Report 107–329(I), *supra.*

In view of HAVA's clear language in the provisional voting provisions, the use of the term "right" and other "rights creating" terms in those provisions, and the

---

shall, on the basis of sex … be subjected to discrimination." *Gonzaga,* 536 U.S. at 284 n. 3, 122 S.Ct. 2268.

**3.** The defendant and intervenors cite legislative history for the proposition that HAVA

establishes no such individual rights. Their quotations, however, are largely misplaced, as they concern the lack of a private right of action, not the creation of an individual right that can be enforced via § 1983.

amplification given to those provisions in the pertinent legislative history, I conclude that Congress unambiguously created an individual right under HAVA.

### 2. HAVA Does Not Create A Comprehensive Enforcement Scheme

The defendant can meet his burden of showing that the rights created by HAVA, though "presumptively enforceable" through a § 1983 suit, *Gonzaga, supra,* 536 U.S. at 284, 122 S.Ct. 2268, are not enforceable under § 1983 by showing "that Congress shut the door to private enforcement either expressly, through 'specific evidence from the statute itself,' or 'impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.' " *Id.* (citations omitted).

If the statute provides a comprehensive enforcement scheme, the remedial process delineated by that scheme, rather than a suit under § 1983, is the appropriate and only means of seeking redress for a violation of the right. *See generally Middlesex County Sewerage Auth. v. National Sea Clammers Assn.,* 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (private enforcement is foreclosed only when the statute creates a remedial scheme that is "sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.").

In this case, Congress did not "shut the door to private enforcement" in HAVA itself by expressly foreclosing suits under § 1983. Thus, whether plaintiffs can seek relief in this court through a § 1983 suit depends on whether Congress closed the door impliedly through creation of a comprehensive enforcement scheme incompatible with a private suit under § 1983.

HAVA provides two distinct mechanisms for enforcement. Under § 15511, the Attorney General may bring a civil action for declaratory and injunctive relief to enforce the provisions of HAVA. Under § 15512, the state may establish administrative procedures to review and resolve citizen complaints. Those procedures are to include a hearing, and if a violation is found, "the State shall provide the appropriate remedy." 42 U.S.C. § 15512(a)(2)(F).

The standard for a determining whether these mechanisms constitute a "comprehensive enforcement scheme" is high. *Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984) ("We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for a substantial equal protection claim. Since 1871, when it was passed by Congress, § 1983 has stood as an independent safeguard against deprivations of federal constitutional and statutory rights.").

The stringency of the standard for finding that alternatives to enforcement via § 1983 is underscored by the fact that courts have rarely found that Congress has adopted such comprehensive enforcement alternatives. As the Supreme Court noted in *Blessing, supra:*

Only twice have we found a remedial scheme sufficiently comprehensive to supplant § 1983: in [*Middlesex Cty. Sewerage Auth. v. Nat. Sea Clammers,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) ], and *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). In *Sea Clammers,* we focused on the "unusually elaborate enforcement provisions" of the Federal Water Pollution Control Act, which placed at the disposal of the Environmental Protection Agency a panoply of enforcement options, including noncompliance orders, civil suits, and criminal penalties. 453 U.S. at 13, 101 S.Ct. at 2622–2623. We emphasized that several provisions of the Act authorized private persons to

initiate enforcement actions. *Id.*, at 14, 20, 101 S.Ct. at 2623, 2626–2627. We found it "hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies, including the two citizen-suit provisions." *Id.*, at 20, 101 S.Ct. at 2626. Likewise, in *Smith*, the review scheme in the Education of the Handicapped Act permitted aggrieved individuals to invoke "carefully tailored" local administrative procedures followed by federal judicial review. 468 U.S. at 1009, 104 S.Ct. at 3467. We reasoned that Congress could not possibly have wanted parents to skip these procedures and go straight to court by way of § 1983, since that would have "render[ed] superfluous most of the detailed procedural protections outlined in the statute." *Id.*, at 1011, 104 S.Ct. at 3468. 520 U.S. at 347, 117 S.Ct. 1353.

Likewise, lower courts have infrequently found that alternative mechanisms adopted by Congress suffice to preclude a § 1983 suit. *See Omnipoint Communications, Inc. v. Penn Forest Twp.*, 42 F.Supp.2d 493, 505 (M.D.Pa.1999) (Federal Telecommunications Act, 47 U.S.C. § 151 et seq., provided "a clear, detailed process that allows quick and complete remedies" and "the § 1983 statutory apparatus adds nothing to plaintiff's remedial armament under the [statute]—except the opportunity to seek attorney's fees under § 1988."). *Accord, National Telecommunication Advisors, Inc. v. City of Chicopee*, 16 F.Supp.2d 117, 118 (D.Mass.1998); *AT & T Wireless PCS, Inc. v. City of Atlanta*, 50 F.Supp.2d 1352, 1360 (N.D.Ga.1999) ("it is difficult to envision a judicial mechanism more comprehensive than that established by Congress in the Telecommunications Act—direct and expedited federal judicial review without any need to exhaust state remedies.").

The defendant contends that the enforcement alternatives available under HAVA constitute a comprehensive enforcement scheme. He points to administrative complaint and review procedures which he has established, though, as the State Plan acknowledges, such proceedings are not "a highly evidentiary process." 69 Fed.Reg. at 14896. According to an unpublished version of the procedures adopted by the defendant, "The Secretary of State retains authority on behalf of the State of Ohio to make the final decision in each instance from the initial screening through a hearing on the record. The Secretary of State;s [sic] determination shall be final and shall not be subject to judicial review." Office of the Ohio Secretary of State, *Election Complaint Procedure Pursuant to Section 402 of the Help America Vote Act of 2002*, § 16(A) (no date).

In addition, the defendant argues that HAVA's legislative history shows that Congress did not intend that there would be any remedies available under the statute aside from either enforcement by the Attorney General or through state administrative proceedings. He notes that Senator Dodd complained about the failure to include a private remedy in HAVA:

> While I would have preferred that we extend [a] private right of action ...the House simply would not entertain such an enforcement provision. Nor would they accept federal judicial review of any adverse decision by a State administrative body. However, the state-based administrative procedure must meet basic due process requirements and afford an aggrieved party a hearing on the record if they so choose.

Cong. Rec. 510504 (daily ed. Oct. 16, 2000) (Statement of Senator Dodd).

The defendant also quotes a statement by representatives of the National Council

of LaRaza, which opposed HAVA's enactment because the statute:

> [c]ontains weak enforcement provisions": Voters who are denied their right to vote because of this law cannot turn to the federal courts for a remedy. Rather, disenfranchised voters must either wait for the Department of Justice to take action or ask the same state election system that disenfranchised them to determine that there is a violation and provide a remedy for the problem.

Cong. Rec. 510501 (daily ed. Oct. 16.2002).

These statement do not, contrary to defendant's contention, evince an intent to disallow suits under § 1983. They simply show, rather, what a reading of HAVA makes clear: namely, that Congress did not provide for a direct right of action under the statute itself. Indeed, the La Raza statement highlights the weakness of HAVA's enforcement mechanisms.

Those enforcement mechanisms do not attain the high standard of the few cases in which courts have found such schemes in place and preclusive of § 1983 claims. As noted in *Blessing, supra*, the enforcement scheme in *Sea Clammers* was "unusually elaborate," 453 U.S. at 13, 101 S.Ct. 2615, and included an opportunity for private persons to institute enforcement actions. *Id.* at 19, 101 S.Ct. 2615. Similarly, as the Court also noted in *Blessing*, the review mechanism in *Smith* was "carefully tailored," and included federal judicial review. 468 U.S. at 1009, 104 S.Ct. 3457.

Enforcement by the Attorney General is not sufficient to foreclose a § 1983 action. Because an individual voter would not have standing to force the Attorney General to bring suit, that avenue is itself insufficient.

*See Blessing*, 520 U.S. at 339, 117 S.Ct. 1353; *see also Wright v. City of Roanoke*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (holding that the Secretary of Housing and Urban Development's powers to audit public housing authorities was insufficient to foreclose an action under § 1983); *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 523, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (holding that Secretary of Health and Human Services's power to withhold funding or reject medicaid plans did not preclude an action under § 1983).[4]

I cannot find Ohio's administrative complaint and review procedure to be the sort of comprehensive enforcement scheme that would preclude § 1983 actions. These procedures do not rise to the level of the alternative enforcement proceedings available in *Sea Clammers* or *Smith*, which both involved not only elaborate and varied remedies, but also private judicial remedies. The Ohio enforcement scheme, in contrast, expressly forecloses judicial review. *State Plan, supra*, 69 Fed.Reg. at 14897.

This lack of *any* judicial review highlights two problems. First, it vests the protection of federal rights solely and finally in the hands of state officials. This situation underscores a basis for the general, and longstanding rule that "the existence of a state administrative remedy does not ordinarily foreclose resort to § 1983." *Wright, supra*, 479 U.S. at 427–28, 107 S.Ct. 766 (citing *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)).

Second, without outside judicial review—even at the state level—the final resolution of an administrative claim rests, ultimately, with the Ohio Secretary of State. He, of course, is the same official

---

4. I note that the list, compiled by the defendant, of pending cases involving challenges to the implementation of HAVA's provisional voting provisions does not include any actions brought by the Attorney General. Doc. 13, at 5).

alleged to have violated the rights extended to plaintiffs' members and other electors by HAVA.

In view of the stringent standard which the defendant must meet to avoid being held accountable under § 1983, I cannot find Ohio's process of administrative review to be a comprehensive enforcement scheme sufficiently strong and effective to preclude relief under § 1983. The defendant, accordingly, has failed to meet his burden of showing that the rights given to individual voters to vote provisionally in HAVA cannot be enforced in this § 1983 suit.

### B. Plaintiffs Have Standing to Enforce the Rights Created by HAVA

The Supreme Court has recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (citations omitted).

■ The associational and organizational plaintiffs meet these requirements in this case.

The plaintiffs will suffer an injury in fact if there is a failure to facilitate provisional voting, which is a prerequisite to collecting and counting the ballots of electors covered by the provisional voting provisions of HAVA. The plaintiffs have the close relation to their members required under *Powers*. See, e.g., *Northampton County Democratic Party v. Hanover Township,*

2004 WL 887386, *5–9 (E.D.Pa. Apr. 26, 2004) (Democratic Party had standing to represent interests of the general electorate); see also *Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*, 280 F.3d 278, 288 n. 10 (3d Cir.2002) ("candidates for public office may be able to assert the rights of voters"); *Walgren v. Board of Selectmen of Amherst*, 519 F.2d 1364, 1365 n. 1 (1st Cir.1975) (same); *Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir.1973) (same). Individual electors cannot effectively challenge noncompliance with HAVA's provisional voting provisions, as they would not know until election day that they had a basis for such challenge. It would then be too late to do anything to regain the franchise, were it taken from them in a manner contrary to HAVA.

The political party plaintiffs have, in any event, standing on their own behalf. Directive 2004–33 directly affects their interests by creating a risk that voters who, by law, are entitled to vote for Democratic candidates for President, Senator, and Representative will be barred from doing so.

### C. Plaintiffs' Suit is Not Untimely

■ Defendant, noting that this suit was "filed within *six weeks* of Election Day" (Doc. 13 at 7) (emphasis in original), suggests that plaintiffs have been dilatory. This contention ignores the fact that plaintiffs filed their complaint eleven days after issuance of Directive 2004–33.

To be sure, this leaves very little time for this court to adjudicate this case, and for the parties to obtain further review. The defendant is, however, responsible for the time crunch: it was he who allowed nearly twenty-three months to pass after HAVA's enactment before issuing Directive 2004–33, which merely recites pre-existing Ohio law, and which was issued less than two months before the deadline

for bringing Ohio's provisional voting regulations in line with the statute.

### D. Directive 2004–33 Conflicts With the Requirements of HAVA

■ The defendant contends that nothing in Directive 2004–33 conflicts with HAVA, and that, in any event, the provisions of the Ohio Revised Code relating to provisional voting control, and are unaffected by HAVA.

Before he issued Directive 2004–33, Blackwell acknowledged the need to alter Ohio's provisional voting procedures to conform to HAVA. *State Plan, supra* 69 Fed.Reg. at 14895 (noting the need to "continue to refine and expand the scope of provisional voting in the state to comply with the spirit, intent and letter" of HAVA); *Election Offices Await Orders,* Cincinnati Enquirer, Aug. 30, 2004 (reporting that defendant was planning to "issue a new directive" in order to "promulgat[e] new rules that he said would be in line with federal election reforms that followed the 2000 elections"); *Blackwell Backs Down on Ballot Ruling,* Cleveland Plain Dealer, Aug. 28, 2004 (reporting defendant's intention to issue "revised orders" to comply with HAVA and the State Plan).

As finally issued, however, Directive 2004–33, which simply restates the requirements of Ohio's pre-existing provisional voting statute, O.R.C. § 3503.16, without referencing HAVA, does none of the things that Blackwell said it would. Directive 2004–33 does not "refine and expand the scope of provisional voting" in Ohio; it promulgates no "new rules ... in line with federal election reforms"; and it provides no "new orders" to Ohio's election officials. Indeed, any officials who read Directive 2004–33 would not learn that HAVA was in existence.

### 1. HAVA Applies to More Voters Than Just Those Who Have Changed Their Residence or Names

■ HAVA is inclusive in its coverage: any registered voter who arrives at a polling place and is told either that his or her name is not on the roll or that he or she is not eligible to vote, is entitled, on written affirmation of his status as a registered voter in the jurisdiction and his eligibility to vote, to receive and cast a provisional ballot. 42 U.S.C. § 15482(a)(2) ("The individual shall be permitted to cast a provisional ballot at that polling place upon the execution of a written affirmation by the individual before an election official at the polling place stating that the individual is—(A) a registered voter in the jurisdiction in which the individual desires to vote; and (B) eligible to vote in that election.").

Directive 2004–33, in contrast, limits the opportunity to vote provisionally to persons who have moved. In doing so, the directive not only fails to comply with HAVA, it misstates Ohio law: Revised Code § 3503.16 authorizes provisional voting not only by persons who have moved, but also by persons who have changed their names.

The Directive, by referencing only one aspect of Ohio law and omitting any reference to or discussion of HAVA, may leave local officials more uncertain about their obligations than if no directive had issued. At best, Directive 2004–33 is incomplete, and fails to provide guidance to County Election Boards and election officials as to their obligations under HAVA. Without adequate guidance, Boards and officials, no matter how well intentioned, are likely to fail to implement HAVA, and thereby disenfranchise the very voters whom HAVA protects.

In an argument not advanced by Blackwell, the intervenors argue that any defect in Directive 2004–33 is, in effect, cured by

O.R.C. § 3503.30, which is captioned, "Mistake in Registration Form." That statute, which is not mentioned in Directive 2004–33, provides that a county elections board "may correct all errors occurring in the registration of electors." Thus, the intervenors contend, a means exists in Ohio to enable persons to vote, even though their names are not listed on the polling place rolls.

This statute is not a meaningful or effective stand-in for HAVA. It applies only to a voter who has "caused himself to be registered in a precinct which was not his place of residence." *Id.* Persons who registered properly in their home precinct, but whose names were omitted from the roll by accident, purging, or otherwise could not avail themselves of any corrective measures that might be implemented under § 3503.30.

Moreover, and as importantly, § 3503.30 does not provide for immediate provisional voting: instead, it merely allows the voter to "correct his registration form." This does not meet the HAVA mandate of vote now, confirm and count later.

To the extent, finally, that the defendant contends that HAVA cannot preempt state law in regulating the incidents of a federal election, he errs. Similarly, to the extent that intervenors contend that the references in Directive 2004–33 to state law suffice to abrogate HAVA, they also err.

 Under the Supremacy Clause, federal law prevails where there is a conflict between state and federal law. U.S. CONST. art. VI, cl. 2 (the "Laws of the United States ... shall be the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding"); *see generally Crosby v. National Foreign Trade Council,* 530 U.S. 363, 373–74, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (invalidating as "an obstacle to the accomplishment of Congress's full objectives" a state

law that "undermines the intended purpose and 'natural effect'" of federal legislation) (quoting *Savage v. Jones,* 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182 (1912)).

HAVA expands substantially the persons who can vote provisionally in federal elections. That expansion cannot, consonant with the Supremacy Clause and our federal system, be undone by either express state statute or state inactivity in the face of HAVA's adoption.

## 2. HAVA Requires Notice to Voters of the Opportunity to Vote Provisionally

 If an unlisted or allegedly ineligible voter tells a poll worker that he or she is registered to vote, the worker, under HAVA, "shall notify" the voter that he or she may vote with a provisional ballot. 42 U.S.C. § 15482(a)(1). This is so, even if the worker determines that the voter lives in another precinct.

Directive 2004–33 does not require such notification. Instead, Directive 2004–33 requires the worker to determine from the Board of Elections both the precinct in which the voter's address is located and where the proper polling place is located.

In some instances, this procedure will work: the correct polling place may be in the same building or otherwise nearby, and the voter can easily go to his or her proper voting venue. In other instances, the voter may be unable to get to that location, or to do so before the polls close. Directive 2004–33 deprives voters in that situation of the franchise, while HAVA, if properly implemented, would preserve it.

## 3. HAVA Does Not Require Residence in the Precinct to be Able to Vote Provisionally

 After the voter has presented himself or herself, been found not to be

listed on the roll or told that he or she is ineligible, and has been told about the opportunity to vote provisionally, he or she must affirm in writing that he or she is registered to vote in that "jurisdiction," and is eligible to vote in that federal election. He or she is then entitled to receive a provisional ballot. 42 U.S.C. § 15482(a)(2).

The parties disagree as to the meaning of the term "jurisdiction" in HAVA. Plaintiffs contend that the term refers to the county, so that a voter can vote provisionally in any precinct in the county in which he or she is registered. The defendant and intervenors assert that the term means precinct, so that the voter can only vote in a precinct in which he or she actually resides.

HAVA does not define the term "jurisdiction." That term is, however, defined in the National Voter Registration Act of 1993 (NVRA), which refers to the "registrar's jurisdiction" as the geographic reach of the unit of government that maintains the voter-registration rolls.[5] See 42 U.S.C. § 1973gg–6(j).

Defining jurisdiction to mean "county," rather than "precinct," makes sense in Ohio, where county boards of election maintain the voter registration rolls. O.R.C. §§ 3501.11(T), (U). "Precincts" are simply smaller units into which counties are divided for the convenience of county boards and voters.

Under HAVA, an unlisted but properly registered voter who appears at a particular precinct will have his or her eligibility determined on the basis of the county's election rolls, not on the basis of the precinct. What matters is the validity of registration, which is kept in and ascertained at the county level. This facilitates, moreover, post-balloting confirmation that the provisional voter was, as he or she affirmed when getting the provisional ballot, registered in the "jurisdiction."

By deeming "jurisdiction" to encompass the county, rather than a precinct, the purpose of HAVA—to preserve the federal franchise—is furthered. Voters who, for whatever reason, would not be able to go to their "home" precinct can still exercise their right to vote for federal offices,[6] which otherwise would be lost. No state interest would be adversely affected, because out-of-precinct ballot would not count as to any local, county, or state issues or offices.

Defendant and intervenors look to the legislative history for support for their contention that provisional ballots need not be allowed in the "wrong" precinct, or, if allowed, need not be counted. As just discussed they have misread the statute, which allows provisional voting in a precinct other than the provisional voter's "home" precinct. Thus, no recourse to legislative history is necessary. See, e.g., Saylor v. United States, 315 F.3d 664, 670 (6th Cir.2003) (finding "no reason to engage in an examination of [a federal statute's] legislative history or policy preferences when the plain text of the Act clearly limits its scope").

---

5. Legislative history supports the view that the term "jurisdiction" in HAVA has the same meaning as the term "registrar's jurisdiction" in the NVRA. See 148 Cong. Rec. S2535 (daily ed. Apr. 11, 2002) (statement of Sen. Dodd) ("It is our intent that the word 'jurisdiction' ... has the same meaning as the term 'registrar's jurisdiction' in section 8(j) of the National Voter Registration Act.").

6. Except, perhaps, the House of Representatives. As plaintiffs point out, an out-of-precinct ballot might also be cast outside the appropriate congressional district. In such case, the provisional ballot would count only in the presidential and senatorial contests.

Nonetheless, most of the legislative history cited by the defendant and intervenors fails to support their restrictive interpretation of HAVA.[7] Two statements on the floor of the Senate by Senator Bond do, however, support the prohibition in Directive 2004–33 against provisional voting in the "wrong" precinct: Senator Bond stated that poll workers may "direct the voter to the correct polling place," 148 Cong. Rec. S10491 (daily ed. Oct. 16, 2002), and refuse "to allow voters to vote from any place other than the polling site where the voter is registered." *Id.* at S10493.

One of these statements is correct: nothing in HAVA prohibits a poll worker, who has notified a voter who has come to the wrong precinct about the ability to vote provisionally, from also informing the voter about the location of his or her home precinct. The voter then can choose whether to vote provisionally where he or she is, thereby forfeiting the right to have any vote for local, county or state offices or issues counted, or her or she can go to the home precinct, where the entire ballot will be tallied. HAVA does not take this choice from the voter, or gag the poll worker.

Senator Bond's statement about refusing "to allow voters to vote from any place other than the polling site where the voter is registered" provides some support for defendant's claim that "jurisdiction" means precinct, rather than county.

The force of this bit of legislative history is undone by statements by others who spoke about where a provisional ballot could be cast. Senator Durbin expressly noted the right of voters "to cast a provisional ballot at their chosen polling place if the voter's name isn't on the list of eligible voters." 148 Cong. Rec. S10496 (daily ed. Oct. 16, 2002). Senator Dodd, HAVA's one of HAVA's chief sponsors, observed that the statute's provisional balloting section would "ensure[ ] that never again can a person who appears at the polls in order to vote and desires to vote [be] turned away, *for any reason.*" *Id.* at S10508. (emphasis added). At best, the legislative history recited by the defendant and intervenors is conflicting, and thus can provide no clear or determinative guidance in interpreting the statute.[8]

7. Three of the seven passages cited by the defendant and intervenors say nothing about provisional voting in the "wrong" precinct, or anything else that supports their positions in this litigation. *See* 148 Cong. Rec. S10510 (daily ed. Oct. 16, 2002) (statement of Sen. Dodd) ("Whether a provisional ballot is counted or not depends solely on State law, and the conferees clarified this by adding language in section 302(a)(4) stating that a voter's eligibility to vote is determined under state law."); *id.* (statement of Sen. Dodd) ("Nothing in this compromise usurps the state or local election official's sole authority to make the final determination with respect to whether or not an applicant is duly registered, whether the voter can cast a regular vote, or whether that vote is duly counted."); *id.* at S10508 (statement of Sen. Dodd) ("Once a provisional ballot is cast, it is within the sole authority of the State or local election official to determine whether or not that bal-

lot should be counted, according to State law.").

Two other passages simply assert that states may refuse to count provisional ballots cast in the wrong "jurisdiction." *See* 148 Cong. Rec. S10491 (daily ed. Oct. 16, 2002) (statement of Sen. Bond) ("It is not the intent of the authors to overturn State laws regarding registration or State laws regarding the jurisdiction in which a ballot must be cast and counted."); *id.* (statement of Sen. Bond) ("If it is determined that the voter is registered in a neighboring jurisdiction and the state law requires the voter to vote in the jurisdiction in which he is registered, ... the vote will not count."). In view of my conclusion that "jurisdiction" means county, these statements are not pertinent.

8. Intervenors also point to a "Best Practices Toolkit" from the Election Assistance Com-

The defendant and intervenors complain that plaintiffs' interpretation of HAVA disregards the role of state law and state officials in the conduct of elections. In support of their contention that the defendant retains discretion to implement, or not implement, HAVA's protections for voters other than those who have moved from one precinct to another, the defendant and intervenors point to two references in § 15482(a)(4) to "State law." ("If the appropriate State or local election official to whom the ballot or voter information is transmitted ... determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law."). No similar references are to be found in §§ 15482(a)(1) or (2), which, respectively, relate to notification of the right to vote provisionally and the casting of a provisional ballot.

The defendant and intervenors appear to believe that an attempt to vote provisionally in a time, place, or manner different from those prescribed in Ohio's pre-HAVA provisional voting law makes the voter ineligible under state law to vote as HAVA would otherwise allow. This contention confuses eligibility to vote with the manner of voting. One remains an eligible voter even if he or she has voted "improperly."

Defendant and intervenors further contend that provisional ballots cast in the "wrong" precinct need not be counted in view of the provision in § 15482(a)(4) of HAVA that provisional ballots are to be counted "in accordance with State law." In their view, a ballot cast in the wrong precinct is, *ipso facto,* not valid under state law, and thus need not be counted, because state law does not permit the counting of invalid ballots.

This contention disregards the purposes of HAVA—to enhance and preserve the franchise in federal elections—and the syntax of § 15482(a)(4), which provides that, if the appropriate election official "to whom the ballot or voter information is transmitted ... determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law."

This sentence consists of two clauses: the first being conditional (if the official "determines that the individual is eligible under State law"), the second being mandatory ("the provisional ballot shall be counted ... in accordance with State law."). Each clause contains its own modifying reference to "State law"; thus, the second such modifying phrase, "in accordance with State law", modifies the verb "counted", and only that verb. In doing so, this language preserves the state's the ability to determine *how* ballots are counted, while federal law, under HAVA, prescribes *whether* they are to be counted, after the voter has been found to be "eligible under State law" to vote in the first instance.

The process of counting "in accordance with State law" has nothing to do with where a ballot was cast. Nor does HAVA, by allowing a provisional ballot to be cast in any precinct within the voter's county of registration, affect Ohio's ability to develop

mission as providing "implicit support" for their interpretation of Directive 2004–33. That material encourages election officials to "[e]stablish sound methods for directing voters to the correct polling place." (Doc. 8, at 18). As noted, nothing in HAVA prevents a poll worker from telling a voter where the correct polling place is located. Even if the "Toolkit" were somehow controlling, it is not inconsistent with the interpretation of HAVA reached herein.

and implement uniform, consistently applied procedures for prompt and accurate counting of all ballots cast by eligible voters. *See* O.R.C. § 3505.27 ("Counting of votes"). HAVA simply ensures that the failure of a person's name to appear on the register does not result in loss of the franchise of an elector whose name should, in fact, have appeared on the roll.

In view of the foregoing, Directive 2004–33, even as applied to a person who has moved or changed his or her name, conflicts with HAVA. By its own terms, the Directive provides that "pollworkers in a precinct must confirm before issuing a provisional ballot that the person to whom the provisional ballot will be issued is a resident of the precinct, or portion of the precinct, in which the person desires to vote." A provisional ballot may issue under the Directive "[o]nly after the precinct pollworkers have confirmed that the person is eligible to vote in that precinct."

HAVA contains no such restriction; indeed, as discussed above, HAVA permits provisional voting *for federal offices* in any precinct in the county in which the voter is registered. All that § 15482(a)(2) requires is that the individual is registered "in the jurisdiction"—that is, the county—in which he or she desires to vote and is "eligible to vote in that election." Once the voter signs the written affirmation required by § 15482(a)(2), no more is required, or allowed, under that section before he or she "*shall be permitted* to cast a provisional ballot at that polling place." *Id.* (emphasis added).

As long as determination of eligibility to vote remains a matter of state law, as it does under HAVA, refusal to allow provisional voting at the "wrong" precinct, as Directive 2004–33 seeks to do, furthers no state interest. If election officials are properly instructed on HAVA's straightforward mechanics (give a ballot, get a

vote), poll workers will not be impeded in their other duties, other voters will not be delayed, and the electoral process will not be disrupted.

Nor is the likelihood of fraud or dilution of the franchise of voters voting in their home precinct dilute. Any attempt to commit voting fraud can be detected when the provisional ballot is opened, and it is determined, on a comparison with the voting register, that the voter voted more than once. The ballots of the voters who voted in their home precinct are not diluted, because the provisional voter's ballot, if cast out-of-precinct, will not count for local, county, or state issues or offices. In which case, the weight of conventional ballots cast in that precinct is enhanced, not diluted.

The defendant has called attention to *Hawkins v. Blunt,* Case No. 04–4177–CV–C–RED (W.D.Mo. Oct. 12, 2004), contending that that decision controls the outcome of the dispute over the meaning of the term "jurisdiction" and whether a voter can vote in a precinct other than his or her home precinct. In *Hawkins,* the court held that requiring unlisted voters, on being told where their home precinct polling place was located, to go to that precinct was permissible, and that a voter's refusal to do so would result in a provisional ballot cast elsewhere not being counted. It also held that requiring a voter to affirm that he or she is eligible to vote at the particular polling place is not impermissible.

The Missouri provisional balloting system, unlike Ohio's under Directive 2004–33, otherwise complied with HAVA, and was not being challenged. The court in *Hawkins* indicated that a blanket refusal to count any ballots cast elsewhere than a voter's home precinct probably would conflict with HAVA. Citing the flexibility given to state officials by HAVA, the court concluded that neither the terms nor in-

tent of HAVA were violated by refusing to count ballots cast by persons who, though informed of the location of their home precinct, refused to go there to vote.

Directive 2004–33, in addition to its other defects (derived, ultimately, from its complete failure to take cognizance of HAVA), does not qualify its expressed prohibition against issuing any out-of-district ballots.

The decision in *Hawkins* is thus distinguishable: Missouri, unlike Ohio, had attempted, and largely succeeded in bringing its provisional voting procedures in line with HAVA. The court in *Hawkins* focused on one aspect of those procedures, finding the narrow grounds on which provisional ballots were not to be counted acceptable under HAVA. In Ohio, in contrast, the prohibition on issuing out-of-precinct ballots is absolute and unqualified. Thus, even under *Hawkins*, Directive 2004–33 contravenes HAVA with regard to that prohibition.

To the extent that my interpretation of HAVA does not accord with that of the Judge in *Hawkins*, I believe that my examination of the statute's language, which that Judge was not called on to undertake, represents a correct interpretation of the statute.

In any event, I am not persuaded that there is a substantial likelihood that voters, once informed of their home precinct (and, as they can be, of the effect on any vote cast for a local, county, or state issue), will insist on voting provisionally in the out-of-district precinct. Overall, few if any voters would appear to be within the category covered even by *Hawkins:* namely, those who deliberately refuse to go to their home precinct.

If *Hawkins* is a correct interpretation of HAVA on the narrow question before that court, its ultimate impact, in terms of un-

cast ballots, is probably very slight. That interpretation, in any event, does not alter the fact that Directive 2004–33, by completely ignoring HAVA, does nothing to bring Ohio's provisional voting procedures into compliance with HAVA. *That* circumstance is what compels the decision, and injunction, in this case; and this decision and injunction are otherwise well grounded and well founded, even if, on this single issue, *Hawkins* were on point and controlling.

■■■ The Directive's "correct precinct" requirement conflicts with HAVA: by purporting to limit absolutely the opportunity to vote provisionally to voters residing within the particular precinct, Directive 2004–33 fails to instruct election officials properly about their obligations under HAVA. The misdirection provided by Directive 2004–33, and, if followed, its disenfranchising effect, " 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Geier v. American Honda Motor Co.,* 529 U.S. 861, 873, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). The "proper precinct" requirement cannot be enforced, in view of its conflict with HAVA, under the Supremacy Clause of the United States Constitution.

### E. Injunctive Relief is Appropriate

In reviewing a request for a preliminary injunction, the Court must consider four factors: 1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; 2) whether the party seeking the injunction will suffer irreparable harm without the injunction; 3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunc-

tion. *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.,* 134 F.3d 749, 753 (6th Cir.1998); *Washington v. Reno,* 35 F.3d 1093, 1099 (6th Cir.1994); *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985). These are factors to be balanced; they are not prerequisites that must be met. *Washington,* 35 F.3d at 1099.

■■■ On consideration of these factors, I conclude that the plaintiffs are entitled to injunctive relief.

### 1. Likelihood of Success on the Merits

The deficiencies of and defects in Directive 2004–33 are many and manifest. Though noting in its opening sentence that "[a]ll boards of election must instruct their pollworkers on the provisional voting procedures authorized by state *and federal law*" (emphasis added), there is no discussion of federal law generally, or HAVA in particular to be found in the Directive. Its sole topic heading ("State Law: Provisional voting eligibility based on elector moving from one Ohio precinct to another") makes clear what the ensuing text confirms: namely, no guidance about federal law is being provided.[9]

The Ohio provisional voting statute, which predates HAVA, limits the ability to vote provisionally to persons who have moved or changed their name. HAVA, in contrast, allows any elector, whose name does not appear on the polling place roll or whose eligibility is in doubt, to receive a provisional ballot on written affirmation that he or she is "a registered voter in the jurisdiction in which [he or she] desires to vote; and ... eligible to vote in that election." 42 U.S.C. §§ 15482(a)(2)(A), (B). The limitation of provisional voting in Ohio

to persons who have moved or changed their names, without more, presents a clear conflict with HAVA, and underscores the plaintiffs' likelihood of success.

There are, as well, other deficiencies in Ohio's provisional voting provisions, and Directive 2004–33, which purports to give guidance about implementing those provisions. There is no requirement that voters be told of the right to cast a provisional ballot. Restriction of place in which provisional ballots may be cast further contravenes HAVA. Nothing in HAVA requires, or even permits, on-site, election - day verification before a provisional ballot may be provided and used.

The conflict between Ohio's provisional voting statute and Directive 2004–33 and HAVA is, accordingly, clear and stark. I conclude, accordingly, that plaintiffs have a substantial likelihood of prevailing in this litigation.

### 2. Irreparable Injury

Sources cited by the plaintiffs, the accuracy of which is not disputed by the defendant or intervenors, indicate that broadly available and fairly implemented provisional voting can secure and preserve the franchise for large numbers of voters in Ohio. *See* Calltech/MIT Voting Technology Project, *Voting: What Is, What Could Be* 30 (2001) (estimating that, nationwide, upwards of 1.5 million votes could have been saved in the 2000 election by use of provisional ballots).

Even if this estimate is inflated or inaccurate, the fact remains that provisional voting as provided and protected by HAVA enhances the franchise, which is among the, if not *the* most fundamental of all rights secured under the Constitution and laws of the United States. As the Supreme Court has observed, "No right is

---

**9.** Indeed, as previously noted, the discussion of Ohio law, which omits reference to persons who have changed their names, is incomplete at best, and misleading at worst.

more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

If the provisional voting right created by HAVA saves but a single vote, its purposes will have been accomplished, and its adoption justified. If even a single vote is lost due to the failure to implement HAVA, that loss alone is irreparable.

Unless Ohio's election officials receive accurate guidance on how to implement HAVA, the risk is great, indeed certain, that persons entitled to vote provisionally will not be given that opportunity, and they will lose their franchise despite the safeguards of HAVA. The harm to such persons is truly irreparable: once they are wrongly turned away from the polls, they cannot return or regain their "voice in the election of those who make the laws under which, as good citizens, we must live."

Denial of the right to vote provisionally in accordance with HAVA affects not only the individual voter whose loses his franchise. Such denial diminishes confidence in the integrity of the electoral process, which, in turn, reduces the incentive to vote. Lessened participation at the polls diminishes the vitality of our democracy, and threatens irreparable damage to our democratic principles and institutions.

The potential harm to citizens and society alike is irreparable, and clearly justifies injunctive relief.

### 3. Balancing of Interests

On balance, the complaints of the defendant and intervenors about the adverse consequences of implementing HAVA fade in the face of the consequences of allowing the defendant to disregard the defects in his Directive 2004–33 and the need to conform Ohio's provisional voting procedures to the mandate of HAVA. The contention that large numbers of voters will deliberately choose to go to a precinct other than the one to which their residence should take them is speculative at best. No examples of any, much less widespread inattention to voting in one's precinct have been cited or can reliably be predicted.

Neither the defendant nor the intervenors cite to any experiences in states which have implemented HAVA's provisional voting procedures as supportive of their concerns and claims. They point to no specific provision in those procedures that makes the risk of abuse of the franchise by fraud or otherwise more likely.

The rather slight possibility that implementing HAVA fully and fairly would disrupt the electoral process or dilute the intervenor's vote is rendered less likely by consideration of what might be gained, and what would be lost, if voters decided deliberately to vote elsewhere than where they should.

Stopping somewhere else might, conceivably, be a bit more convenient for some voters. Even if convenience were a motivating impulse, shopping for some other polling place would eliminate the opportunity to vote for local, county, and state issues and offices.

Even if some voters decided to vote elsewhere than their assigned precinct, the defendant and intervenors point to no basis for believing that such conduct would be widespread. Moreover, the intervenors' concern that the effect of their votes would be diluted is, as noted above incorrect. A vote by an out-of-district voter enhances the effect of the votes cast by those for whom the same polling place is their home precinct.

The defendant points to no specific administrative problems, that threaten the efficiency or integrity of the administration of the election process. He does not contend—aside from his unpersuasive argument about the untimeliness of plaintiffs' suit—that implementation of HAVA would create insurmountable problems, or even modest difficulties, even with regard to the upcoming election.

Nor could he make such contentions persuasively. Most of the necessary guidance that he should be providing to county election officials and precinct poll workers can be taken directly from or presented in a paraphrase of § 15482, which could hardly have been drafted more clearly or succinctly. All that appears to be necessary is to recite when and for whom provisional voting is to be made available, describe the procedures for implementing HAVA, and explain the conflicts between HAVA and prior practices.

Balancing the interest of each elector, including those electors represented by the plaintiffs, with the interests of the defendant and intervenors, I find that the interests of those entitled to vote provisionally under HAVA substantially outweigh any interests that could be or have been urged in opposition to full and fair implementation of HAVA. The balance of interests supports injunctive relief.

### 4. The Public Interest

For the same reasons as those recited above, the public interest will best be served by ordering the defendant to issue instructions that will enhance the protections provided by HAVA for those entitled under the statute to cast provisional ballots. At issue is the integrity of the franchise, particularly where through human error or otherwise the franchise could be withheld. At issue, as well, is public confidence in the integrity of the franchise, and

in the impartiality of public officials responsible for protecting the right to vote.

In response to these considerations, the defendant claims Ohio's precinct-based election system will be threatened by fraud and procedural chaos. The defendant and intervenors offer nothing but speculation to support these claims. They do not show how alternative methods of overcoming the risk of fraud might prove ineffective This a burden that they should meet before claiming that enhancement of the franchise through implementation of HAVA should not occur.

Balanced against the risk that an elector might be disenfranchised entirely if unable to vote provisionally as permitted under HAVA, the risk that electors will engage in "stop and shop" voting, and thereby encumber poll workers with unmanageable burdens, is slight. If given proper guidance, poll workers will be able simply and efficiently to preserve the franchise of persons whose names do not appear on the register of eligible voters but who are, in fact, registered voters.

Implementing HAVA need not be complicated. The essence of the statute is: give a ballot, get a vote, and confirm eligibility and count that vote later. The defendant and intervenors have offered nothing that shows that the public interest will be anything other than promoted if an injunction issues.

The Help America Vote Act is but one in a long line of federal statutes enacted to secure the right to vote and make the franchise available and effective. Among these are the Voting Rights Act of 1965, 42 U.S.C. § 1971, et seq., which restored the franchise to citizens from whom it had been withheld for a hundred years; the Voting Accessibility for the Elderly and Handicapped Act of 1984, 42 U.S.C. § 1973 et seq.; and the National Voter Registration Act of 1993, 42 U.S.C. § 1973 gg et

seq. Each of these provisions, like HAVA, expanded the franchise, and thereby promoted the goal of increased citizen participation in the most important civic event in any democratic society.

Like all remedial legislation, HAVA "should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Like all laws relating to elections, HAVA should as well, be implemented fully and fairly to accomplish the objective of expanding and securing the franchise.

Balancing the concerns expressed by the defendant and intervenors against the rights provided under HAVA's provisional voting provisions, the policies those rights further, and the great public interest in increasing and upholding the franchise, I conclude that the public interest favors injunctive relief.

### Conclusion

The time between now and the election is short. But I am confident that enough time remains to write and distribute a directive that does what Directive 2004–33 fails to do: provide clear guidance to Ohio's election officials so that the purpose of HAVA—to ensure that the right to vote exercised to the maximum extent possible—is accomplished.

I am confident that, once properly instructed, Ohio's election officials will have little difficulty in implementing HAVA's provisional voting procedures.

Writing an appropriate directive is the defendant's responsibility: the defendant shall, therefore, be ordered to submit a HAVA-compliant directive in accord with this Order forthwith.

For the foregoing reasons, it is

ORDERED THAT

1. The defendant's motion to dismiss, and that of the intervenors, be, and the same hereby are denied; and

2. The plaintiffs' motion for a preliminary injunction be, and the same hereby is granted: The defendant J. Kenneth Blackwell, Secretary of State of the State of Ohio, and his employees, agents, representatives, and successors in office are hereby enjoined and restrained from applying the provisions of Ohio Secretary of State Directive 2004–33 that, as described herein, violate the Help America Voting Act of 2002, 42 U.S.C. §§ 15301, et seq.; and said defendant J. Kenneth Blackwell shall forthwith, in compliance with this Order, prepare, and, not later than 4 p.m., Monday, October 18, 2004, file with this Court a Directive that complies with the Help America Vote Act, and shall otherwise be consistent with this Order.

So ordered.