BAY COUNTY DEMOCRATIC PARTY and Michigan Democratic Party, Plaintiffs,

v.

Terri Lynn LAND, Michigan Secretary of State, and Christopher M. Thomas, Michigan Director of Elections, in their official capacities, Defendants.

and

Michigan State Conference of NAACP Branches, Association of Community Organizations for Reform Now, and Project Vote, Plaintiffs,

v.

Terri Lynn Land, Michigan Secretary of State, and Christopher M. Thomas, Michigan Director of Elections, in their official capacities, Defendants.

Nos. 04–10257–BC, 04–10267–BC.

United States District Court, E.D. Michigan, Northern Division.

Oct. 19, 2004.

See also 340 F.Supp.2d 802.

Michael L. Pitt, Peggy G. Pitt, Pitt, Dowty, Royal Oak, MI, for Plaintiffs.

Gary P. Gordon, Heather S. Meingast, Stephen M. Geskey, Michigan Department of Attorney General, Lansing, MI, for Defendants.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND DENYING DEFENDANTS' MOTIONS TO DISMISS

LAWSON, District Judge.

The plaintiffs in these consolidated matters have filed actions against the Michigan secretary of state and her director of elections challenging directives issued by the director to local election officials concerning the casting and tabulation of provisional ballots. Federal law now provides that a voter whose qualification to vote in a federal election is challenged must be allowed to cast a provisional ballot, which is segregated and counted later if the voter's eligibility can be verified. Michigan law requires that voters register to vote in their jurisdiction, that is, in the city, village or township of their residence; and a voter may cast a ballot in person only at the polling place for his or her home precinct, which is a geographical subdivision within the jurisdiction. The plaintiffs contend that federal and State law requires local election officials to count a provisional

ballot cast by a voter at any precinct within the voter's home city, village or township. The defendants' have ordered local election officials to count no provisional ballots cast by voters outside of their own precincts. Plaintiffs Michigan Democratic Party and Bay County Democratic Party insist that the defendants' directives violate their rights established under the Help America Vote Act of 2002 (HAVA), Pub. L 107–252, 116 Stat. 1666, 42 U.S.C. § 15301, *et seq.*, and seek to enforce those rights via 42 U.S.C. § 1983. Plaintiffs Michigan State Conference of NAACP Branches (NAACP), Association of Community Organizations for Reform Now (ACORN), and Project Vote contend that the directives are preempted by HAVA, and further assert that the defendants' actions will violate their rights under the Constitution and state laws. NAACP, ACORN and Project Vote also challenge the defendants' directives pertaining to proof of identity for first-time voters who register by mail. All plaintiffs filed motions for a preliminary injunction, and the Court held a hearing and heard testimony in open court on October 13, 2004.

After reviewing the parties' submissions and considering the evidence, the Court concludes that the plaintiffs have standing to assert their claims, HAVA creates individual rights enforceable through Section 1983, Congress has provided a scheme under HAVA in which a voter's right to have a provisional ballot for federal offices tabulated is determined by State law governing eligibility, and the defendants' directives for determining eligibility on the basis of precinct-based residency are inconsistent with State and federal election law. The Court finds that Michigan election law defines voter qualifications in terms of the voter's home jurisdiction, and a person who casts a provisional ballot within his or her jurisdiction is entitled under federal law to have his or her votes for federal

offices counted if their eligibility to vote in that election can be verified. The Court also finds that the defendants' directives concerning proof of identity of first-time voters who registered by mail are consistent with federal and State law. The Court will grant in part and deny in part the motions for preliminary injunction and deny the defendants' motions to dismiss.

## I. Background, Facts and Proceedings.

■ Any sensible laws regulating the time, place and manner of voting in a democracy ought to focus on two goals: maximizing the participation of eligible voters and eliminating fraud. However, these goals often are in tension, since regulations that guard against fraud may also raise barriers so high that some eligible voters may not be able to pass. Similarly, relaxing the rules that protect against voting more than once in a single election and verify eligibility may increase the possibility of fraud. Congress generally has left to the States the task of crafting regulations that strike an appropriate balance. *See* U.S. Const. Art. I, § 4, cl. 1 (providing that the States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives"); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (holding that the States retain the power to regulate their own elections); *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (observing that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes"). However, Congress has the authority to "at any time make or alter such regulations." U.S. Const. Art. I, § 4, cl. 1; *see Oregon v. Mitchell,* 400 U.S. 112, 118, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970)

(plurality opinion) (holding that Congress has the power to regulate voter eligibility criteria in national elections), *superceded by* the Twenty-sixth Amendment.

In the 2000 presidential election, thousands of eligible voters were not permitted to vote due to the improper or erroneous administration of local election laws. *See* National Commission on Election Reform, *To Assure Pride and Confidence in the Electoral Process,* at 34 (2001). A joint study conducted by the California Institute of Technology and the Massachusetts Institute of Technology estimated that some three million potential votes were lost because of problems with the voter registration process. *See* Caltech/MIT Voting Technology Report, *Voting: What Is, What Could Be,* at 30 (2001) Approximately half of those votes could have been saved, the study concluded, through the use of so-called "provisional ballots." *Ibid.*

## A. Provisional Voting.

■ Provisional voting is a means by which voters whose names do not appear on the election-day registry at their polling place can nonetheless cast votes on "provisional ballots." *Ibid.* These provisional ballots are segregated from the regularly-cast ballots and counted only upon verification by election officials that the voter is in fact registered to vote and was either erroneously excluded from the rosters or, in some cases, mistakenly appeared at the incorrect polling place. *Ibid.* A voter partakes in the process by placing his provisional ballot in an envelope bearing his signature and containing information about the circumstances surrounding the provisional vote sufficient for follow-up investigation. *Ibid.* If elections officials later verify the voter's eligibility, then the provisional ballot is removed from the segregated envelope and counted toward those offices for which the voter is eligible to vote. *Ibid.* If election officials are unable to determine the voter's eligibility, the ballot remains sealed and the vote uncounted. *Ibid.*

## B. The Help America Vote Act of 2002.

■ In 2002, Congress enacted the Help America Vote Act (HAVA), 42 U.S.C. § 15301 *et. seq.*, to address several problems experienced during the 2000 federal election. For example, Subtitle A of Title II, part I provides for the establishment of an election assistance commission that serves, among other things, as a "national clearing house and resource for the compilation of information and review procedures with respect to the administration of Federal elections ..." Section 202, 42 U.S.C. § 15321. This commission conducts studies and issues reports as part of its mandate. *Ibid.* Subtitle D of Title II directs funding to states for improving the administration of federal elections and access to voters with disabilities, research grants for new technologies, and pilot programs for testing new equipment and technologies. Section 251 *et seq,* 42 U.S.C. § 15401 *et seq.* Title III directs state officials to establish voting system standards, provide for a computerized statewide voter registration list, follow certain requirements for voters who register by mail, and adhere to certain minimum standards in the conduct of federal elections. Sections 301, 303–304; 42 U.S.C. § 15481, 15483–84.

Section 302 of the Act requires the States to implement a procedure that allows a voter whose eligibility is challenged to cast a provisional ballot and to have such a system in place "on and after January 1, 2004." 42 U.S.C. § 15482(a), (d). That Section provides:

> If an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to

vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot as follows:

(1) An election official at the polling place shall notify the individual that the individual may cast a provisional ballot in that election;

(2) The individual shall be permitted to cast a provisional ballot at that polling place upon the execution of a written affirmation by the individual before an election official at the polling place stating that the individual is—

(A) a registered voter in the jurisdiction in which the individual desires to vote; and

(B) eligible to vote in that election;

(3) An election official at the polling place shall transmit the ballot cast by the individual or the voter information contained in the written affirmation executed by the individual under paragraph (2) to an appropriate State or local election official for prompt verification under paragraph (4);

(4) If the appropriate State or local election official to whom the ballot or voter information is transmitted under paragraph (3) determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law.

42 U.S.C. § 15482(a)(1)-(4).

Section 303 of the Act establishes new requirements for identifying first-time voters who registered to vote by mail. The provision states:

[A] State shall, in a uniform and non-discriminatory manner, require an individual to meet the requirements of paragraph (2) if—

(A) the individual registered to vote in a jurisdiction by mail; and

(B)(i) the individual has not previously voted in an election for Federal office in the State; or

(ii) the individual has not previously voted in such an election in the jurisdiction and the jurisdiction is located in a State that does not have a computerized list. . . .

(2) Requirements—(A) In general. An individual meets the requirements of this paragraph if the individual—

(i) in the case of an individual who votes in person—

(I) presents to the appropriate State or local election official a current and valid photo identification; or

(II) presents to the appropriate State or local election official a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. . . .

B) Fail-safe voting.—(i) In person.—An individual who desires to vote in person, but who does not meet the requirements of subparagraph (A)(i), may cast a provisional ballot under section 15482(a) of this title. . . .

42 U.S.C. § 15483(b)(1) & (2).

### C. Michigan Public Act 92, 2004.

In April 2004, the Michigan legislature enacted Public Act 92 of 2004, which amended Michigan's election law and implemented many of HAVA's reforms. Two sections of 2004 P.A. 92 deal with provisional ballots: the section codified at Mich. Comp. Laws § 168.523a prescribes the circumstances for casting provisional ballots,

and Section 168.813 regulates the tabulation of provisional ballots. Section 523a states that provisional ballots shall be furnished on election day to persons whose names do not appear on the list of registered voters at a polling place, or who do not furnish appropriate identification, or who are directed to another polling place but refuse to go there, or if the election official is not able to contact a clerk in the jurisdiction to verify the voter's eligibility. Section 813 states that provisional ballots shall be tabulated only "if a valid voter registration record for the elector is located or if the identity and residence of the elector is established using" an acceptable form of identification. Mich. Comp. Laws § 168.813(1).

Public Act 92 also addressed HAVA's requirements for first-time voters who register by mail:

> A person who registers to vote in a jurisdiction in this state by mail shall vote in person and shall provide identification as required under section 303(b) of the help America vote act of 2002, 42 USC 15483, if that person has not previously voted in person in this state.

Mich. Comp. Laws § 168.509t(2).

### D. The June 2004 Directive.

On June 16, 2004, defendant Christopher M. Thomas, the state director of elections, issued a nine-page memorandum entitled "HAVA Compliance Procedures and Processes" aimed at summarizing the secretary's view of the applicable law with respect to casting and counting provisional ballots. The memorandum covers the provisional balloting process, first-time mail registrants, new public posting requirements on election day, voter registration forms revised, registration and voting rights of absent uniformed services voters, and the complaint process. The memorandum also includes reference to an enclosed form entitled *"Procedure for Issuing a Ballot If Voter's Name Does Not Appear on Registration List: A Four–Step Procedure."* Compl. Ex. 2. This form replaced the "Affidavit of Voter Registration" that the state has used since 1995.

Step one on the form requires the prospective voter to complete an affidavit in which the voter attests to residence in his or her city or township and states his or her address. *Id.* at 3. The voter must additionally "affirm that [he or she] submitted a voter registration application on or before the close of registration for the election at hand." *Ibid.* The voter and the local election official then sign and date the affidavit.

In step two, the "election inspector asks the voter to complete a voter registration application." *Ibid.*

Step three is more detailed and contains five parts for which the election official is instructed to answer "yes" or "no" to five questions concerning the voter's address and identification:

**STEP THREE: ELECTION INSPECTOR issuing ballot must answer the five questions provided below.**

**(1) Check with the clerk to confirm that the voter is not registered to vote in any other precinct in the city or township. Were you able to reach the clerk to make this check? (Answer "No" if (1) you were unable to reach the clerk or (2) the clerk advised that the voter is, in fact, registered in a different precinct. Answer "Yes" if you reached the clerk and the clerk advised that the person is *not* registered in a different precinct.)**

**(2) Does the voter claim that he or she registered to vote before the close of registration for the election?**

**(3) Check the voter's identity. Is the voter able to identify himself or herself by showing a Michigan Driver License, Michigan Personal Identifi-**

cation Card, other government issued photo identification card or a photo identification card issued by a Michigan university or college?

If "Yes," check one of the following and enter requested information: Michigan Driver License (enter number), Michigan Personal Identification Card (enter number), Other government issued identification card (describe).

If "No," ask the voter for any form of identification and complete following: (Voter showed a different form of identification (describe), Voter was unable to show any form of identification).

(4) **Check the voter's residential address. If the voter is able to** *confirm that he or she currently resides in the precinct* **by showing a Michigan Driver License, Michigan Personal Identification Card, other government issued or a photo identification card issued by a Michigan university or college? (Answer "No" if voter shows a Michigan Driver License, Michigan Personal Identification card, other government issued or a photo identification card issued by a Michigan university or college** *that contains an address outside of the precinct.***)**

If "No," ask voter if he or she can confirm that he or she currently resides in the precinct by showing any of the following documents (1) a current utility bill (2) a current bank statement (3) a current paycheck or government check or (4) any other government document. If voter produces such document, describe below and indicate if the document contains the voter's name and address:

(5) **Did the voter complete and submit a voter registration application?** (If "No," explain).

*Id.* 3–4.

Step four details the procedure for issuing an "envelope" or provisional ballot and depends on the answers to the questions to step three:

*STEP FOUR:* **ELECTION INSPECTOR issues a regular ballot or an "envelope" to voter as explained below.**

- **If you answered "Yes" to** *all five of the questions* **appearing under Step Three, issue a regular ballot to the voter:**

(1) Prepare ballot as a "challenged" ballot and issue to the voter...

(2) Enter the voter's name in the poll book and write "CHALLENGED BALLOT" next to the voters name.

(3) Direct voter to a voting station and permit voter to vote ballot

\* \* \*

- **If you answered "No" to** *any of the five questions* **appearing under Step Three, issue an "envelope" ballot to the voter:**

(1) Prepare ballot as "challenged" ballot and issue to the voter ...

(2) Enter the voter's name in the poll book and write "ENVELOPE BALLOT" next to the voters name.

(3) Direct voter to a voting station and permit voter to vote ballot.

(4) After the voter has voted the ballot, direct the voter to place the ballot in a PROVISIONAL BALLOT SECURITY ENVELOPE....

(5) Seal the PROVISIONAL BALLOT SECURITY ENVELOPE and complete the entries on the outside of the envelope....

*Id.* at 5–6.

The June 16, 2004 memorandum also references an enclosed document entitled

"Procedure for Handling 'Envelope' Ballots Returned to Clerk's Office," which outlines the procedures to be followed by clerk's offices statewide for determining whether a provisional ballot should be counted. The document instructs that provisional ballots must be evaluated within six days after the election. Based on the information on the four-step procedure form attached to the ballot envelope, the instructions state that an "envelope" ballot may be counted if:

- A valid voter registration application for the elector is located; the registration application was submitted by the elector on or before the 'close of registration' for the election at hand; and the 'envelope' ballot voted by the elector was issued in the proper precinct.

OR

- The elector signed the affidavit to affirm that he/she submitted a voter registration application on or before the 'close of registration' for the election at hand; the elector identified himself or herself by showing a Michigan Driver License, Michigan Personal Identification Card, other government photo identification card or a photo identification card issued by a Michigan university or college; and the elector confirmed that he or she currently resides in the precinct where the 'envelope' ballot was issued by showing 1) one of the above documents OR 2) a current utility bill, current bank statement, current paycheck, or government check or any other government document.
- Stated in simpler terms, the 'envelop' ballot counts if the voter signed the affidavit, confirmed his or her identity with an acceptable form of photo ID AND confirmed his or her residence in the precinct where the 'envelope' ballot was issued with the photo ID OR by producing one of the listed alternative documents (current utility bill, current bank statement, current paycheck or government check or any other government document)

*Procedure for Handling Envelop Ballot* at 2 (Mich. Dept. Of State June 16, 2004). By contrast, the clerk may not count an "envelope" ballot if:

- The elector refused or failed to sign the affidavit to affirm that he/she submitted a voter registration on or before the 'close of registration' for the election at hand.

OR

- The elector was unable to identify himself or herself by showing a Michigan Driver License, Michigan Personal Identification Card, other government photo identification card or a photo identification card issued by a Michigan university or college.

OR

- The elector was unable to confirm that he or she currently resides in the precinct where the 'envelope' ballot was issued by showing one of the above documents or a current utility bill, current bank statement, current paycheck or government check or any other government document.

*Ibid.*

Part two of the document outlines the "federal ID requirement." An "envelope" ballot "cannot be counted if the elector failed to provide one of the following forms of identification at the polls: a current and valid photo identification (such as a drivers license or personal identification card), or a paycheck stub, utility bill, bank statement, or a government document which

lists the electors name and address." *Ibid.* Part three of the document instructs clerks on the disposition of valid "envelope" ballots that can be counted. *Ibid.* If the ballot meets the requirements in part one, the clerk is to remove the ballot from the security envelope. *Ibid.* The ballot is then placed in the container. After all valid provisional ballots are placed in the container, the ballots are removed and the clerk counts the valid votes on the ballot. *Ibid.* After counting the ballots, the clerk is to fill out a provisional ballot report form and submit it to the appropriate county or local canvassing board. Finally, after the valid votes from the "envelope" ballots are recorded, the ballots and their security envelopes are sealed in the ballot container, and a ballot tag is affixed to the seal indicating that the container holds valid and counted "envelope" ballots. *Ibid.*

### E. The Plaintiffs' Complaints.

On September 28, 2004, plaintiffs Bay County Democratic Party and Michigan Democratic Party filed a complaint on behalf of their members and all registered voters in the State seeking declaratory relief, injunctive relief, and attorneys fees against the Michigan secretary of state and the director of elections in their official capacities alleging that the directives issued by the defendants violated their rights guaranteed by HAVA and Public Act 92. These plaintiffs base their claim on 42 U.S.C. § 1983; they allege that the June 16 memorandum improperly prevents local election officials from counting provisional ballots of voters who are found to be qualified to vote in the "jurisdiction" but who cast their provisional ballots in the wrong "precinct." They contend that voters whose names are not on polling place rosters and who show up in the correct *jurisdiction* but at the incorrect *precinct* will be disenfranchised when their provisional ballots remain uncounted. The

plaintiffs moved for a preliminary injunction, and that day the Court ordered expedited service and briefing to insure prompt resolution of the dispute before the November 2, 2004 election.

On October 1, 2004, the NAACP, ACORN, and Project Vote filed a lengthier complaint against the same defendants based on the June 16, 2004 memorandum. These plaintiffs allege that identification requirements prescribed by the June 16 memorandum and appended documents instructing local election officials to not count out-of-precinct provisional ballots cast by voters in the proper jurisdiction violate HAVA (counts one and two); the memorandum abridges their rights under the First and Fourteenth Amendment (counts three and four); it violates the Equal Protection Clause of the Fourteenth Amendment (counts five and six); and it contravenes the Michigan election law (count seven) and the Equal Protection Clause of the Michigan Constitution (counts eight and nine). Both sets of plaintiffs also filed motions for a preliminary injunction.

### F. Proceedings.

On October 5, 2004, the defendants moved to transfer venue to the United States District Court for the Western District of Michigan where the state government is located and requested immediate consideration of their motion. The Court ordered expedited responses and denied that motion in a written opinion on October 13, 2004. *See Bay County Democratic Party v. Land,* 340 F.Supp.2d 802 (E.D.Mich.2004). On October 6, 2004, the Court of its own accord consolidated the cases and made applicable the September 28 scheduling order to both cases. The defendants responded in opposition to the preliminary injunction motions and moved to dismiss the respective complaints. On October 7, 2004, Michael Walsh, Daniel

Krueger, Linda Coburn, Janice Vedder, and Diane Mosier sought leave to intervene as defendants. Walsh alleges that he is a registered voter in Lansing, Michigan, and the others are county and municipal clerks seeking to intervene in their official capacities; these individuals oppose plaintiffs' motion for preliminary injunction.

On October 13, 2004, the Court heard testimony and oral argument in open court on the plaintiffs' respective motions for preliminary injunction and the defendants' motion to dismiss. The plaintiffs offered the testimony of five witnesses, and the defendant called Director Thomas to testify and supplement the affidavits he filed in opposition to the plaintiffs' requests for relief.

### 1. Mark Brewer

The first witness to testify was Mark Brewer, the chairman of the Michigan Democratic Party. He stated his organization organizes poll watchers who are lawyers and lay people who attend polling places on election day to see that election laws are enforced. As chairman, he is responsible for reviewing and addressing complaints the party receives from members concerning problems encountered with voting. For the 2000 general election and the August 2004 primary election, he said that he received numerous complaints, including some from Bay County, that voters had been turned away from polls because their names did not appear on the registered voter list. Brewer explained that, where warranted, the Michigan Democratic Party followed up with legal challenges at the polls and attempted to secure a "guest vote" for voters who appeared at the incorrect precinct. According to Brewer, hundreds of prospective voters were denied a vote in the August 2004 primary election because poll workers directed individuals to incorrect polling stations and, in many cases, voters simply ran out of time to find the right polling place.

Brewer acknowledged that a provisional voting system that permitted persons to vote in the correct city or township but the incorrect polling place theoretically could be abused. His experience, however, led him to believe that people do not wish to show up at the wrong polling place. Mr. Brewer also admitted that he was not aware of the director of election's October 1, 2004 revised memorandum that permits provisional voters six days after election day to provide documentation to local election officials. Mr. Brewer could also not say with certainty how many turned-away voters at the August 2004 primary election were in the correct precinct but not on polling place lists and how many voters were actually directed to the correct polling place.

### 2. Holly Holliday

Holly Holliday, an attorney, testified that she has worked for Project Vote for more than a year mobilizing lower income individuals, especially persons of color, the homeless, and ex-felons, to register to vote. She testified that most of the people with whom she deals do not have transportation, own a computer, or have access to e-mail. Immediately before the August primaries, she testified, she obtained an updated polling place list from the Detroit city clerk and noticed several locations had changed. As a result, many of her constituents went to the incorrect polling place. The staff at her Detroit office spent the day answering approximately 150 calls from confused voters. Project Vote's other offices received about thirty to fifty calls from concerned voters. Holliday attempted to direct many to the correct polling place, but because of the short notice, the large distances between polling places, and the lack of transportation or money

for public transportation, many were not able to cast ballots.

Holliday also testified approximately twenty percent of the 40,000 voters registered by her organization were homeless, meaning that they had no permanent address. Many lacked photo identification or a state identification card. Generally, Holliday used a mail in registration form for these individuals. She acknowledged that State election law requires first time voters that mail in a registration application to produce identification on voting day. These individuals lack an address, valid identification, pay checks with stubs, bank statements, or other government correspondence to meet identification requirements for first time voters at the polls as required by the June 16 memorandum. On cross-examination, Holliday explained that her organization pays workers to register voters at the rate of eight dollars per hour and a bonus of $ 1.50 for every voter registered above twenty-five. She also admitted that some of her employees had committed fraud by attempting to submit false names on voter registration forms; however, she said that she fired these workers immediately and worked closely with prosecutors to file charges.

### 3. Ruth M. Moore

Ms. Moore testified that she resides in Saginaw, Michigan and works as a dry cleaner. She is married and her husband is seventy-two years old. Ms. Moore has been registered to vote in Saginaw for twenty-six years and has voted in each election since 1979. For the 2004 primary election, Ms. Moore and her husband went to their usual polling place at the town hall as indicated on their registration card. They were told by a poll worker that their names were not on the voter list, and they were directed to a polling place some two miles away. When they arrived there, they were again told that they were in the incorrect polling place. After a friend of Ms. Moore looked in the voting rolls and told her that her name, appearing on page sixty-one or two, listed her polling station as the town hall. Her friend suggested that they return there with the page number from the voter list. Ms. Moore and her husband went back to the town hall, gave the information to the poll worker, and they were allowed to vote. Ms. Moore said that the ordeal lasted about two hours.

### 4. Joyce Seals

Joyce Seals is a former mayor and councilwoman for Saginaw, Michigan and presently works as a community organizer. She works with church organizations to register members to vote and offers to transport members to polling places on election day. She was working in this capacity during the August 2004 primary election. Ms. Seals testified that both her son and daughter were turned away from their proper polling place twice because their names were not on the voter list, and she witnessed ten others experience problems trying to vote while she was at the polling place. She claimed that even the Saginaw City manager had difficulties in finding the proper polling place.

### 5. Yvonne White

Ms. White is currently the president of the Michigan NAACP and testified that she was aware of many of her members who did not have identification, especially those recently released from institutions. However, Ms. White acknowledged that it was the policy of the NAACP when conducting its own elections for officers to require members to present either their NAACP membership card or other photo identification. Otherwise, she admitted, it would be difficult to identify individuals as members with a right to vote.

### 6. Christopher Thomas

Christopher Thomas, the Michigan director of elections, was the only witnesses to testify on behalf of the defendants. He supplemented the affidavits he filed in opposition to the plaintiffs' request for an injunction and reiterated his belief that Congress did not intend to discourage the States' use of precinct-based voting when it passed HAVA. He stated that a primary reason for organizing voting by precincts was to ensure that individuals voted for representatives that actually represented them. He explained that in Michigan, there are nineteen cities and townships that contain more than one Congressional district, and the precinct system helps ensure that voters cast their vote for representatives in their own district. When redistricting occurs, precincts grow and shrink and polling places for individuals can change. In addition, he testified that polling places are a scarce commodity and that there is a cap of 2,999 voters per precinct to aid in effective election-day administration.

Mr. Thomas acknowledged that the term "jurisdiction," as that nomenclature was used in the Michigan election law, refers to a city, village or township, and that a precinct is a subdivision of the "jurisdiction." Voters register according to the jurisdiction of their residence and they are given a voter registration card that assigns them to a precinct. Votes are cast at the precinct polling place, but provisional ballots are not counted there; provisional ballots are counted in the office of the clerk for the jurisdiction, that is, the city, village, or township.

Mr. Thomas also testified to what he believed would be "chaos" if provisional ballots were to be counted along jurisdictional lines. He believed that voters would simply choose the most convenient polling place regardless of their assigned precinct. As a result, polling places would be clogged, and voters would be discouraged from casting their ballots. He also believed that organizations could bus people to precincts so that they could provisionally vote for individuals in offices that did not represent those voters. However, he admitted that current technology allowed a ballot to be counted for one office if another office was not marked properly, disregarding only the improper office. He also stated that he was not aware of any plan to defeat the precinct-based system of voting or to bus voters to the wrong precincts.

He also testified that because of the short time until the general election, Wednesday, October 20, 2004 was the last day to attempt to train election officials in new procedures. As it stands, he said that election officials have never dealt with voting along jurisdictional lines. He also stated that it was not currently possible to disregard all offices for which provisional voters had no right to vote except by hand counting ballots. Hand counting was simply not feasible within the prescribed six-day period for counting provisional ballots. Mr. Thomas anticipated that over four million votes will be cast in Michigan in the November 2004 general election, but he was not able to estimate how many provisional ballots would be cast.

Finally, Mr. Thomas testified that he advised the Michigan Legislature in drafting Public Act 92, and he did not insist on clearer language that specifically mentioned counting provisional ballots along precinct lines because he was of the opinion that there was no need to due to the broad deference accorded to state law in HAVA. He also indicated that the identification requirements in the October 7, 2004 directive parroted the requirements in HAVA and only applied to contested voters and first-time voters who mailed in their registration applications. There are

several options to meet this identification requirements and he opined that voters would not be overly burdened.

At the conclusion of the testimony, the Court heard legal arguments and granted the parties a brief period to file supplemental memoranda. From the bench, the Court granted the proposed intervenors' request to consider their submission as an amicus brief.

## II. Standing.

The defendants contend that none of the organizations that are plaintiffs in these consolidated actions has standing to assert the claims in the respective complaints. *See* U.S. Const., art. III § 2 (limiting the "judicial power of the United States" to actual "cases" and "controversies"). The plaintiffs argue that they have standing in their own right and under a theory of third-party standing to raise their respective statutory and constitutional claims.

■■■ Standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "The Supreme Court has stated that the standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into 'a vehicle for the vindication of the value interests of concerned bystanders.'" *Coal Operators and Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915–16 (6th Cir.2002) (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). "To satisfy Article III's standing requirement, a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be 'fairly traceable' to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury." *Coal Operators*, 291

F.3d at 916. Thus, the constitutional requirements for standing include proof of injury in fact, causation, and redressability. *Ibid.*

■■■ In addition to the constitutional requirements, a plaintiff must also satisfy three prudential standing restrictions. *See id.* First, a plaintiff must "assert his own legal rights and interests, and cannot rest his claim for relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499, 95 S.Ct. 2197 (citations omitted). Second, a plaintiff's claim must be more than a "generalized grievance" that is pervasively shared by a large class of citizens. *Coal Operators*, 291 F.3d at 916 (citing *Valley Forge*, 454 U.S. at 474–75, 102 S.Ct. 752). Third, in statutory cases, the plaintiff's claim must fall within the "zone of interests" regulated by the statute in question. *Ibid.* "These additional restrictions enforce the principle that, 'as a prudential matter, the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted.'" *Coal Operators*, 291 F.3d at 916 (quoting *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 576 (6th Cir.1991)).

■■■ Standing must exist at each stage of litigation, and the burden a plaintiff must satisfy depends on the posture of the case. At the initial pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). When not injured in its own right, an association has standing when its members would otherwise have standing. *Friends of the Earth, Inc. v. Laidlaw Env. Servs.,*

528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

▮ The defendants challenge the plaintiffs' organizational standing on the ground that their members face no injury in fact. The injury alleged by the plaintiffs is that if the June 16 (and now the October 7) directive is enforced, some of their members will be deprived of the right conferred by HAVA to cast provisional ballots out-of-precinct and have those ballots counted once it is determined that they are eligible to vote in their jurisdiction. The parties do not dispute that the right to vote is fundamental and the deprivation of that right constitutes an injury. However, the defendants argue that the plaintiffs' injuries are neither concrete and particular nor actual and imminent, but rather based on the unsubstantiated fear that (1) some voters may go to the wrong polling station; (2) some of these voters may or may not be members of the plaintiffs' organizations; and (3) an unknown number of persons of unknown political parties will attempt to vote in the wrong precinct.

The defendants fail to note at least one certainty in this case: an out-of-precinct provisional ballot cast by the plaintiffs' constituent who is qualified to vote in the jurisdiction will not be counted in the general election that is but a few weeks away under the directive now in place. Given that fact, the question of whether the plaintiffs allege an injury in fact turns on whether it is speculative to assume that members of the plaintiffs' organizations will be among those voters that cast provisional ballots in the wrong precincts.

▮ The exact identity of the group of qualified voters who will cast provisional ballots from incorrect polling places, by definition, cannot be known. Generally, the existence of past injury is insufficient to demonstrate future injury. However,

the experience with past elections provides a basis for finding the legislative facts already determined by Congress when it enacted HAVA. For instance, the Caltech/MIT study, cited by defendant Thomas in his affidavits, concluded that over three million ballots were lost in the 2000 national election and that more than half of those votes could have been saved by provisional voting. At the hearing on plaintiffs' motion for preliminary injunction, the plaintiffs introduced evidence of a number of voters were turned away from polls four years ago and as recently as the August 2004 primary elections due to administrative error. The plaintiffs are organizations that represent and mobilize voters, and two are registered political parties claiming injury on behalf of Democratic voters. The Court believes that the prospect of recurrence at the upcoming general election is beyond speculation: the plaintiffs will suffer an injury in fact if provisional ballots cast by voters who are eligible under State law are not counted. Moreover, political parties and candidates have standing to represent the rights of voters. *Penn. Psych. Society v. Green Spring Health Servs., Inc,* 280 F.3d 278, 288 n. 10 (3d Cir.2002) (stating that "candidates for public office may be able to assert the rights of voters"); *Walgren v. Board of Selectmen of Amherst,* 519 F.2d 1364, 1365 n. 1 (1st Cir.1975) (observing that "[w]e have in the past indicated that a candidate has standing to raise the constitutional rights of voters"); *Mancuso v. Taft,* 476 F.2d 187, 190 (1st Cir.1973) (same); *see also Northampton County Democratic Party v. Hanover Twp.,* 2004 WL 887386 at *5–9 (holding that the Democratic Party had standing to represent interests of the general electorate).

▮ Likewise, both causation and redressability have been established. A plaintiff shows causation when an injury is

"fairly traceable" to the challenged action of the defendants. The defendants argue that the issuance of the memorandum in no way affects a voters' decision to appear at the incorrect precinct. However, the defendants misconstrue the requirement for alleging causation. It is sufficient that the pleadings show that the challenged action is fairly traceable to the injury. *See Lujan*, 504 U.S. at 573, 112 S.Ct. 2130. Here, the alleged injury is the unlawful failure to count provisional ballots. According to the plaintiffs' view of the applicable legislation, a voter's appearance at the incorrect polling place will not cause his ballot not to be counted; it is the defendants' directive to local election officials that will cause that result. The directive, therefore, is fairly traceable to the failure to count a provisional ballot.

■■■ The Supreme Court has described the redressability component as a causal connection between the alleged injury and the relief sought. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Generally, a plaintiff need not show beyond a question that a favorable judgement will redress his injury; a "probabilistic benefit from winning suit" is sufficient. *Family & Children's Ctr., Inc. v. School City of Mishawaka*, 13 F.3d 1052 1058 (7th Cir.1994). The question posed in this case is whether a preliminary injunction will prevent defendants from failing to count provisional ballots cast by eligible voters in the wrong precinct. An injunction here will achieve that result. The plaintiffs have established standing in their own right.

■■■ The plaintiffs also have satisfied the requirements for third-party standing prescribed by the Supreme Court in *Powers v. Ohio*, 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991): an injury in fact suffered by the litigant, a close relation to the third party, and a hindrance to the third party's ability to protect his or her own rights. The plaintiffs will suffer an injury if their members who are qualified to vote do not have their votes counted, since that will diminish the political power of the organizations. The organizations are closely related to their membership. And the plaintiffs' individual members will not know about their impending disenfranchisement until election day when it will be too late to challenge the rules of the secretary and director of elections.

The Court finds that the plaintiffs have established standing to bring their claims.

### III. Motions for Preliminary Injunction.

■■■ This Court must consider four factors when determining whether a preliminary injunction should issue: (1) the likelihood of the party's success on the merits of the claim; (2) whether the injunction will save the party from irreparable injury; (3) the probability that granting the injunction will substantially harm others; and (4) whether the public interest will be served by the injunction. *See Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir.1998), *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 399 (6th Cir.1997); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985). "[T]he four factors are not prerequisites to be met, but rather must be balanced as part of a decision to grant or deny injunctive relief." *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir.1995). The district court must make specific findings regarding each of the four factors, unless fewer factors are dispositive of the issue. *See Six Clinics Holding Corp.*, 119 F.3d at 399. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med.*

*Exam'rs,* 225 F.3d 620, 625 (6th Cir.2000). The plaintiffs' burden is the same irrespective of whether the relief sought is mandatory or prohibitive. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.,* 163 F.3d 341, 348 (6th Cir.1998) (stating that "[w]e therefore see little consequential importance to the concept of the status quo, and conclude that the distinction between mandatory and prohibitory injunctive relief is not meaningful. Accordingly, we reject the Tenth Circuit's 'heavy and compelling' standard and hold that the traditional preliminary injunctive standard— the balancing of equities—applies to motions for mandatory preliminary injunctive relief as well as motions for prohibitory preliminary injunctive relief").

## A. Likelihood of Success on the Merits.

█ The Democratic Party plaintiffs have brought their claim under 42 U.S.C. § 1983, which states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution shall be liable to the party injured." To establish a claim under 42 U.S.C. § 1983, the plaintiff must satisfy two elements: (1) that there was a deprivation of a right secured by the Constitution or the laws of the United States and (2) that the deprivation was caused by a person acting under color of state law. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The second element is not in dispute. The defendants, purporting to act as secretary of state and the director of elections, oversee the administration of elections pursuant to federal and state law. Under the first element, plaintiffs must demonstrate that the alleged violations of HAVA will cause deprivations of rights secured by that statute. *See Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (recognizing that Section 1983 actions may be brought against state actors to enforce rights created by federal statutes as well as by the Constitution).

The NAACP, ACORN, and Project Vote do not invoke Section 1983, but rather contend that HAVA preempts state law and the defendants' directive. However, the gravamen of their claim is the same as the Democratic Party plaintiffs, and it stands or falls on the finding whether HAVA creates rights that are privately enforceable.

## 1. Whether HAVA Creates Privately Enforceable Rights.

█ The defendants contend that HAVA does not create a private right of action that can be enforced through Section 1983. Such claims frequently arise in the context of legislation enacted pursuant to Congress' spending authority. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 279–82, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). For instance, in *Wilder,* 496 U.S. at 501, 110 S.Ct. 2510, the Supreme Court held that the Boren Amendment to the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A), created rights privately enforceable under Section 1983 against state agencies. The Court recognized only two exceptions in which statutory rights are not actionable:

> A plaintiff alleging a violation of a federal statute will be permitted to sue under Section 1983 unless (1) "the statute does not create enforceable rights, privileges, or immunities within the meaning of § 1983," or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself."

496 U.S. at 508, 110 S.Ct. 2510 (quoting *Wright v. City of Roanoke Redevelopment and Housing Auth.*, 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). The Court established a three-part test to determine whether the first exception exists, i.e., whether the statute creates private rights:

(1) Was the provision in question intended to benefit the plaintiff?

(2) Does the statutory provision in question create binding obligations on the defendant governmental unit, rather than merely expressing a Congressional preference?

(3) Is the interest the plaintiff asserts specific enough to be enforced judicially, rather than being "vague and amorphous"?

*Id.* at 509, 110 S.Ct. 2510.

■ The second exception comes into play only where Congress has "provid[ed] a comprehensive enforcement mechanism for protection of a federal right." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). The existence of administrative protection will not itself foreclose private enforcement. "Rather, the statutory framework must be such that allowing a plaintiff to bring a § 1983 action would be inconsistent with Congress' carefully tailored scheme." *Id.* at 107, 110 S.Ct. 444.

■ In *Gonzaga University*, the Supreme Court clarified the standard that may have been confused by conflating its cases dealing with the question of whether a statute created an implied private right of action with those cases determining whether private rights enforceable under Section 1983 were created. The Court held that "in either case we must first determine whether Congress intended to create a federal right." 536 U.S. at 283,

122 S.Ct. 2268. "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" *Id.* at 284, 122 S.Ct. 2268 (citing *Cannon v. University of Chicago*, 441 U.S. 677, 692, n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). The Court stated that the statute must unambiguously confer "rights," not merely "benefits." *Id.* at 283, 122 S.Ct. 2268. Thus, the inquiry "simply require[s] a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Id.* at 285, 122 S.Ct. 2268.

■ The provision in HAVA upon which the plaintiffs rely states:

*If an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote,* **such individual shall be permitted to cast a provisional ballot.**

42 U.S.C. § 15482(a) (emphasis added). The statute also states that "[t]he individual shall be permitted to cast a provisional ballot at that polling place upon the execution of" the appropriate affirmation. *Id.* § 15482(a)(2). This language unambiguously creates in the voter the right to cast a provisional ballot under certain circumstances. In case there would be any doubt, Congress, in another part of the Act, included that right among those that must be posted by election officials at the polling place. *See* 42 U.S.C. § 15482(b)(2)(E) (stating that election officials must post "general information on voting rights under applicable Federal and State laws, including information on *the right of an individual to cast a provision-*

*al ballot* and instructions on how to contact the appropriate officials if these rights are alleged to have been violated") (emphasis added).

Certainly, other sections of HAVA, perhaps a majority of them, primarily regulate the conduct of officials involved in the voting process. There can be little question, however, that the language quoted above was intended to benefit voters who are turned away from the polls. It is this type of unmistakable rights-focused language that the Supreme Court has found to establish a private right of action in other contexts. *See, e.g., Cannon,* 441 U.S. at 690, 99 S.Ct. 1946 (holding that statute providing that "[n]o person shall be subjected to discrimination" constituted individually focused language and thus a private right of action). Although the defendants refer to excerpts from Congressional debate suggesting that senators considered but choose not to adopt a private right of action, they provide no citation to any clear statutory authority negating the creation of a private right. *See Gonzaga,* 536 U.S. 285–86, 122 S.Ct. 2268 (the plain language of the statute controls the determination of a private right of action).

Next, the statutory language clearly creates an obligation on local election officials to allow provisional voting under the circumstances set forth in Section 302, and to count the ballots of eligible voters. This mandate extends well beyond a Congressional preference. HAVA states unambiguously that the right to vote in federal elections includes the right to cast a provisional ballot when a voter's qualifications are challenged or his or her name does not appeal on the voter roll.

Last, this right can easily be enforced judicially. The right to vote is clear. There is nothing vague or amorphous about a court order to permit provisional balloting or to count ballots of voters determined to be eligible to vote in the jurisdiction according to State law.

■ The defendants also maintain that other enforcement mechanisms contained within HAVA preclude the finding of a privately-enforceable right. However, to negate the finding of a private right, the other enforcement mechanisms generally must be sufficiently comprehensive so as to raise an inference that Congress intended to foreclose a private enforcement. *See Wright,* 479 U.S. at 423–24, 107 S.Ct. 766. In *Wright,* low-income tenants brought action under Section 1983 claiming that alleged over-billing of utilities violated the Brooke Amendment that capped public housing rent. Although the statute created oversight by HUD, the Supreme Court rejected the argument that no private right was created, reasoning:

We disagree with the Court of Appeals' rather summary conclusion that the administrative scheme of enforcement foreclosed private enforcement. HUD undoubtedly has considerable authority to oversee the operation of the [statute]. We are unconvinced, however, that respondent has overcome its burden of showing that the remedial devices provided in the Housing Act are sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983. They do not show that Congress specifically foreclosed a remedy under § 1983. Not only are the Brooke Amendment and its legislative history devoid of any express indication that exclusive enforcement authority was vested in HUD, but there have also been both congressional and agency actions indicating that enforcement authority is not centralized and that private actions were anticipated. Neither, in our view, are the remedial mechanisms provided sufficiently comprehensive and effective to raise a clear infer-

ence that Congress intended to foreclose a § 1983 cause of action for the enforcement of tenants' rights secured by federal law.

*Id.* at 423–24, 107 S.Ct. 766.

Here, HAVA provides two methods of enforcement: the United States Attorney General is vested with the authority to bring an action to enforce specific provisions under HAVA; and the states may establish administrative procedures to receive voter complaints. As in *Wright*, however, the defendants have not met their burden of demonstrating that these remedial devices support an inference that Congress foreclosed private enforcement of the rights that HAVA confers. There is no indication in the text of HAVA that these mechanisms were meant to be exclusive.

The Supreme Court observed in *Blessing v. Freestone*, 520 U.S. 329, 347, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), that only on two occasions did it find "a remedial scheme sufficiently comprehensive to supplant § 1983." On those two occasions the Court dealt with statutes that included "elaborate enforcement mechanisms," private rights of action, and administrative procedures that were followed by federal judicial review. *Ibid.* Those mechanisms are absent from HAVA. Moreover, the Supreme Court has found that the availability of an administrative complaint system is generally insufficient by itself to infer an intent to preclude private enforcement. *See Widler*, 496 U.S. at 523, 110 S.Ct. 2510 (holding that "[w]e also reject petitioners' argument that the existence of administrative procedures whereby health care providers can obtain review of individual claims for payment evidences an intent to foreclose a private remedy in the federal courts." The availability of state administrative procedures ordinarily does not foreclose resort to § 1983) (citing *Patsy v.*

*Board of Regents of Fla.,* 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)). There likewise is no indication here that the state administrative complaint process, which would relegate the plaintiffs to the unenviable task of asking the secretary of state to overturn her own directives, was meant to replace a private right that is enforceable pursuant to Section 1983.

### 2. Precinct–Based Voting of Provisional Ballots Under HAVA and Michigan Law.

The Court believes that the question of whether the defendants' directive to local election officials not to count out-of-precinct provisional ballots violates certain voter rights is entirely a matter of statutory construction. The parties have made liberal reference to the legislative history of HAVA on this issue, but the Supreme Court consistently has counseled that "in any case of statutory construction, [the] analysis begins with the language of the statute. . . . And where the statutory language provides a clear answer, it ends there as well." *Hughes v. Aircraft v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *see also Olden v. LaFarge Corp.,* 203 F.R.D. 254, 262 (E.D.Mich.2001), *aff'd* 383 F.3d 495 (6th Cir.2004) (noting that "the statute, not the Committee Report, . . . is the authoritative expression of the law") (quoting *City of Chicago v. Envtl. Def. Fund,* 511 U.S. 328, 337, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994)). The "cardinal rule" is "that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *Conroy v. Aniskoff,* 507 U.S. 511, 514, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993). Only if the statutory provision at issue is ambiguous, courts may look in. "good faith" to the legislative history. *Wis. Pub. Intervenor v. Mortimer,* 501 U.S. 597, 610, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991).

The plaintiffs do not allege an inconsistency between HAVA and the October 7 directive as to who may *cast* a provisional ballot; therefore, the focus of the inquiry is on the sections of HAVA and Michigan law that prescribe when a provisional ballot must be *counted.* However, the whole statute must be examined to apprehend the context. As previously stated, the plaintiffs contend that provisional ballots must be counted if the voter is determined to be qualified to vote in the jurisdiction where the ballot is cast. The defendants insist that provisional ballots cast in the jurisdiction but outside the voter's home precinct may not be counted.

▆▆▆ The language of Section 302(a) of HAVA is set forth above. Under HAVA's plain language, a voter eligible to vote in a federal election who is registered "in the jurisdiction," and who attests to that fact, must be allowed to cast a provisional ballot if his or her name does not appear on the list of voters "for the polling place." 42 U.S.C. § 15482(a)(1). The parties concede that the term "jurisdiction" is not defined in the statute. As the plaintiffs point out, Congress directed that HAVA be construed in harmony with the National Voter Registration Act (NVRA) of 1993. *See* 42 U.S.C. § 15545(a)(4). The NVRA defines "jurisdiction" as "an incorporated city, town, borough, or other form of municipality" unless a larger unit of government, such as a county, maintains the voter registration rolls, 42 U.S.C. § 1973gg–6(j); in Michigan, therefore, "jurisdiction" means the city, village or township of the voter's residence, as the defendants have acknowledged.

The provisional ballots are to be counted "in accordance with State law" if the election official determines that the voter is "eligible to vote under State law." The defendants argue that to be eligible to vote under Michigan law, the voter must cast his or her vote in his or her home precinct. Likewise, they argue that a vote cannot be counted under Michigan law unless the vote is cast in the voter's home precinct. To allow otherwise, they contend, would provoke the demise of precinct voting, a result that was never intended by Congress when it enacted HAVA.

Michigan's precinct-based voting system by itself does not violate HAVA, and the plaintiffs do not advance that argument. The plaintiffs do argue that despite the State's requirement that a voter must offer to vote only at his or her own precinct's polling place, a voter who goes to the wrong polling place in the jurisdiction (city, village or township) in which that voter is eligible to vote must be allowed to cast a provisional ballot for the federal offices in contention and have that vote counted.

▆▆▆ The Court finds that no current provision in the Michigan election law disqualifies or renders ineligible a voter who casts a provisional ballot for a federal office for which he or she is qualified to vote within his or her jurisdiction but outside of his or her home precinct. An examination of the pertinent Michigan statutes confirms that point.

In Michigan, a list of eligible voters is maintained on a state-wide basis in the State's Qualified Voter File that was mandated by 1994 Public Act 441 and first placed into operation in the 1998 election. *See* Mich. Comp. Laws § 168.509o. However, Michigan law allows for the use at precincts of either voter registration lists or voter registration cards to identify the voters who may vote at a particular polling place. *See* Mich. Comp. Laws § 168.523(1). An individual desiring to vote at a polling place is required to complete a ballot application containing his or her signature and address. *Ibid.* If the person's name does not appear on the

voter registration list at the polling place, the person may obtain a ballot by showing a receipt that verifies timely registration and signing a new voter registration application. Mich. Comp. Laws § 168.523a(1)(a). If the person cannot produce a receipt, then the election official must determine the person's correct polling place, not according to a state-wide voter list, but "based on residence information provided by the individual." Mich. Comp. Laws § 168.523a(1)(b).

Michigan law requires that election officials "shall direct an individual who is not in the appropriate polling place to the appropriate polling place." Mich. Comp. Laws § 168.523a(1)(b). If that voter refuses to go to the correct polling place, the voter must be allowed to cast a provisional ballot. *Ibid.*

If the election official determines by the person's address that he or she is at the correct polling place, although the person's name is not on the voter list for that polling place, then the person must be allowed to submit a sworn statement that he or she had timely registered to vote "and is eligible to vote in the election." Mich. Comp. Laws § 168.523a(2). The election official then must attempt to contact the city or township clerk. If the clerk in the jurisdiction verifies the voter's information, and the person is able to produce an acceptable form of identification,[1] then the person must be allowed to vote a provisional ballot. The provisional ballot will be processed as a challenged ballot and tabulated on election day. Mich. Comp. Laws § 168.523a(4). If the election official cannot reach the clerk in the jurisdiction to verify the person's information,

or if the voter is not in the correct precinct, or if the person cannot produce an acceptable form of identification (but produces some form of identification), or if the acceptable identification shows an address other than the person's current address and the person has a current bank statement, utility bill or government document, then the person shall be allowed to cast a provisional ballot that is secured for verification after the election. Mich. Comp. Laws § 168.523a(5).

Michigan law provides for the tabulation of provisional ballots only as follows:

> Within 6 days after the election, for each provisional ballot that was placed in a provisional ballot return envelope, the city or township clerk shall determine whether the individual voting the provisional ballot was eligible to vote a ballot and whether to tabulate the provisional ballot. In making this determination, the city or township clerk shall not open the provisional ballot return envelope. *A provisional ballot shall only be tabulated if a valid voter registration record for the elector is located or if the identity and residence of the elector is established* using [an acceptable form of identification] along with a document to establish the voter's current residence address as provided in section 523a(5). Before the provisional ballot is tabulated, election officials shall process the ballot as a challenged ballot under [State law].

Mich. Comp. Laws § 168.813 (emphasis added).

---

1. According to State law, an acceptable form of identification consists of "a Michigan operator's or chauffeur's license, department of state issued personal identification card, other government issued photo identification card, or a photo identification card issued by a [public] institution of higher education in this state ... that contains a current residence address to establish his or her identity and residence address." Mich. Comp. Laws § 168.523a(4).

As mentioned above, HAVA requires that local election officials furnish a provisional ballot to a person whose name is not on a local registered voter list if the person affirms that he or she is "(A) registered voter in the jurisdiction in which the individual desires to vote; and (B) eligible to vote in that election." 42 U.S.C. § 15482(2). Federal law requires further that if local election officials determine "that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law." 42 U.S.C. § 18482(4).

In Michigan, a person is eligible to vote if "[t]he person [is] a citizen of the United States; not less than 18 years of age; a resident of the state for not less than 30 days; and a resident of the township, city, or village on or before the thirtieth day before the next regular or special election or primary election." Mich. Comp. Laws § 168.492; *see also* Mich. Const. art. I § 2 (1963) (stating that "[e]very citizen of the United States who has attained the age of [18] years, who has resided in this state six months, and who meets the requirements of local residence provided by law, shall be an elector and qualified to vote in any election except as otherwise provided in this constitution"); Mich. Comp. Laws § 168.10 (providing that "[t]he term 'qualified elector', as used in this act, shall be construed to mean any person who possesses the qualifications of an elector as prescribed in section 1 of article 2 of the state constitution and who has resided in the city or township 30 days"). Such a person is "entitled to be registered as an elector in the township, city, or village in which he or she resides." Mich. Comp. Laws § 168.492.

An "election precinct" is defined by Michigan law as "a political subdivision, the area of which is embraced in its entire-ty within the confines of a city, ward, township or village, and for which not more than 1 polling place is provided for all qualified and registered electors residing therein." Mich. Comp. Laws § 168.654. A voter does not register to vote in a precinct, although the voter is assigned to a precinct upon registration according to his or her residence. However, a voter does not become "ineligible" to vote by casting his or her vote in a precinct within his or her jurisdiction other than his own. Such a voter would remain a "qualified elector" under State law.

The defendants point to other provisions of the Michigan election law as supporting the argument that a person is "eligible" to vote only in his or her own precinct. For instance, Michigan Complied Laws Section 168.491 states that, except where a person has changed residences within sixty days of an election, a local election official "shall not receive the vote of a person whose name is not registered in the registration book or listed on the computer voter registration precinct list of the township, ward, or precinct in which he or she offers to vote." However, this section does not speak to the voter's eligibility to vote. Moreover, HAVA requires that such a person be furnished a provisional ballot for the federal election and allowed to cast it. *See* 42 U.S.C. § 15482(a)(1) & (2) (stating that "[i]f an individual declares that such individual is a registered voter *in the jurisdiction in which the individual desires to vote* ... but the name of the individual does not appear on the official list of eligible voters for the polling place ... *such individual shall be permitted* to cast a provisional ballot;" and that"[t]he individual shall be permitted to cast a provisional ballot *at that polling place*") (emphasis added). Sections 168.727 and 168.729 authorize election officials to challenge a voter whom they suspect "is not a qualified and registered elector of the precinct."

However, the statutes prescribing the qualifications to vote do not include residency in the precinct, since registration in Michigan is organized by "jurisdiction," that is, city, village, and township. Mich. Comp. Laws § 168.10; 168.492. In addition, Michigan's provisional ballot statute contemplates that an "eligible voter" may attempt to vote in the incorrect precinct, Mich. Comp. Laws § 168.523a(2), (5), in which case a provisional ballot is cast *and tabulated* if later the city or township clerk is able to locate "a valid voter registration record" *or* the municipal clerk is able to verify "the identity and residence of the elector." Mich. Comp. Laws § 168.813(1). Section 168.813(1) does not include a requirement that the provisional ballot be cast in the "correct" precinct.

The defendants also point to a criminal statute that states that "[a] *qualified and registered elector* shall not offer to vote or attempt to vote in a voting precinct in which the elector does not reside, *except as otherwise provided in this act.*" Mich. Comp. Laws § 168.932a(d) (emphasis added). The statutory language, however, presumes that the elector attempting to vote out-of-precinct is "qualified." Moreover, the new language introduced this year by Public Act 92 "otherwise provides" that provisional ballots may be issued to out-of-precinct qualified voters. *See* Mich. Comp. Laws § 168.523a(5) (2004) (stating that "[i]f ... the individual is not in the correct precinct ..., the individual *shall be issued a provisional ballot* that is not tabulated on election day but is secured for verification after the election").

■ The court concludes, therefore, that a person who is over eighteen years old, timely registers to vote in the city, village, or township of his or her residence, and lives in the jurisdiction for more than thirty days is eligible under State law to vote in that jurisdiction. Such a person

who casts a provisional ballot is entitled to have his or her votes "counted ... in accordance with State law" for the appropriate federal offices once election officials are able to verify the voter's eligibility. 42 U.S.C. § 15482(a)(4).

■ The defendants also argue that out-of-precinct provisional ballots need not be counted under HAVA since votes cast in the "wrong" precinct are not to be tabulated "in accordance with State law." The same argument was made recently and rejected by the learned judge in the United States District Court for the Northern District of Ohio. This Court agrees with and adopts the grammatical gloss that the court placed on Section 302(a)(4) of HAVA:

Defendant and intervenors further contend that provisional ballots cast in the "wrong" precinct need not be counted in view of the provision in § 15482(a)(4), which provides that, if the appropriate election official "to whom the ballot or voter information is transmitted ... determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law."

This sentence consists of two clauses: the first being conditional (if the official "determines that the individual is eligible under State law"), the second being mandatory ("the provisional ballot shall be counted ... in accordance with State law."). Each clause contains its own modifying reference to "State law"; thus, the second such modifying phrase, "in accordance with State law", modifies the verb "counted", and only that verb. In doing so, this language preserves the state's [ ] ability to determine *how* ballots are counted, while federal law, under HAVA, prescribes *whether* they are to be counted, after the voter has been

found to be "eligible under State law" to vote in the first instance.

The process of counting "in accordance with State law" has nothing to do with where a ballot was cast.

*Sandusky County Democratic Party v. Blackwell,* 339 F.Supp.2d 975, 992–93 (N.D.Ohio,2004).

In Michigan, State law prescribes *how* provisional ballots are to be counted: in certain circumstances, they are to be processed as challenged ballots and tabulated at the precinct on election day by election inspectors, *see* Mich. Comp. Laws § 168.523a(4); in other circumstances, they are not to be tabulated on election day, but secured for verification later by the city or township clerk. *See* Mich. Comp. Laws § 168.523a(5). However, conflating the issues of *how* provisional ballots are to be counted with *whether* they may be counted would allow the State to undo the protections mandated by HAVA through the simple expedient of legislating that *no* provisional ballots are to be counted "in accordance with State law." The Court does not believe that Congress intended through Section 302(a)(4) to provide the States a means of ignoring provisional ballots cast by voters whose eligibility to vote in a federal election was verified in accordance with State law.

The defendants argue that Congress did not intend HAVA to dismantle the precinct-based voting system put in place by many of the States. The Court agrees. The parties acknowledge that HAVA applies only to federal elections. *See, e.g.,* 42 U.S.C. § 15481 (establishing voting standards "used in an election for Federal office"); *Id.* § 15482 (prescribing provisional voting in "an election for Federal office"). Michigan validly may require voters to adhere to the precinct method of casting votes, direct voters to their correct precincts, accept only those regular ballots

cast on election day at the proper precinct, and even punish with serious criminal penalties voters who knowingly offer to vote out of precinct. *See* Mich. Comp. Laws § 168.932a(d). The State may choose other methods of enforcing its precinct-based voting requirements. However, the State's enforcement methods may not include invalidating or refusing to count provisional ballots cast by voters eligible to vote for federal offices in their jurisdiction.

Other courts have addressed the impact of HAVA on the requirement of precinct-based voting in other states. In *Sandusky County Democratic Party v. Blackwell, supra,* Judge James Carr considered the argument made by the Ohio secretary of state that provisional ballots cast in the "wrong" precinct need not be counted even under HAVA. Judge Carr rejected that argument with these words:

The defendant and intervenors appear to believe that an attempt to vote provisionally in a time, place, or manner different from those prescribed in Ohio's pre-HAVA provisional voting law makes the voter ineligible under state law to vote as HAVA would otherwise allow. This contention confuses eligibility to vote with the manner of voting. One remains an eligible voter even if he or she has voted "improperly."

. . .

Nor does HAVA, by allowing a provisional ballot to be cast in any precinct within the voter's county of registration affect Ohio's ability to develop and implement uniform, consistently applied procedures for prompt and accurate counting of all ballots cast by eligible voters. *See* O.R.C. § 3505.27 ("Counting of votes"). HAVA simply ensures that the failure of a person's name to appear on the register does not result in loss of the franchise of an elector whose name should, in fact, have appeared on the roll.

In view of the foregoing, Directive 2004–33, even as applied to a person who has moved or changed his or her name, conflicts with HAVA. By its own terms, the Directive provides that "pollworkers in a precinct must confirm before issuing a provisional ballot that the person to whom the provisional ballot will be issued is a resident of the precinct, or portion of the precinct, in which the person desires to vote." A provisional ballot may issue under the Directive "[o]nly after the precinct pollworkers have confirmed that the person is eligible to vote in that precinct."

HAVA contains no such restriction; indeed, as discussed above, HAVA permits provisional voting *for federal offices* in any precinct in the county in which the voter is registered. All that § 15482(a)(2) requires is that the individual is registered "in the jurisdiction"—that is, the county—in which he or she desires to vote and is "eligible to vote in that election." Once the voter signs the written affirmation required by § 15482(a)(2), no more is required, or allowed, under that section before he or she "*shall be permitted* to cast a provisional ballot at that polling place." *Id.* (Emphasis added).

As long as determination of eligibility to vote remains a matter of state law, as it does under HAVA, refusal to allow provisional voting at the "wrong" precinct, as Directive 2004–33 seeks to do, furthers no state interest. If election officials are properly instructed on HAVA's straightforward mechanics (give a ballot, get a vote), poll workers will not be impeded in their other duties, other voters will not be delayed, and the electoral process will not be disrupted.

*Id.*, 2004 WL 2308862 at \*14–\*17.

*Hawkins v. Blunt*, dkt no. 04–4177–CV (W.D.Mo., Oct. 12, 2004), dealt with a Mis-souri law that implemented the provisional voting requirements of HAVA. That law limited the scope of provisional balloting to federal elections, federal candidates, and state-wide candidates and initiatives. *See* Mo.Rev.Stat. § 115.430(1) (2000 & Supp. 2004). The new law provides that a voter whose name does not appear on the rolls of the precinct register may vote a provisional ballot after identifying himself, although the provisional ballot will only "contain the statewide candidates and issues, and federal candidates." Mo.Rev. Stat. § 115.430.2 (2000 & Supp.2004). The statute further provides that "[i]f the voter declares that the voter is eligible to vote and the election authority determines that the voter is eligible to vote at another polling place, the voter shall be directed to the correct polling place or a central polling place as established by the election authority.... If the voter refuses to go to the correct polling place or a central polling place, the voter shall be permitted to vote a provisional ballot at the incorrect polling place, but such ballot shall not be counted." *Ibid.* The statute also states:

Prior to certification of the election, the election authority shall determine if the voter is registered and entitled to vote and if the vote was properly cast. The provisional ballot shall be counted only if the election authority determines that the voter is registered and entitled to vote. Provisional ballots voted in the wrong polling place shall not be counted.

Mo.Rev.Stat. § 115.430.4 (2000 & Supp. 2004).

In *Hawkins*, Judge Richard Dorr held that the provisions of Missouri's new provisional voting statute did not contravene HAVA, and that HAVA was not intended to override a State's preference for precinct-based voting. He found that the

State properly could require election officials to direct a voter to his or her "correct polling place," if that could be ascertained; and he construed the statute to allow the voter the option of going there or to "a central polling place." *Id.*, slip op. at 19. If the election official could not determine the voter's "correct polling place," the voter is given a provisional ballot. As to the prohibition against counting provisional ballots contained in Subsection 4 of the statute, Judge Dorr observed:

> The final contested provision, Missouri Revised Statute section 115.430.4, is certainly troublesome when interpreted literally and not in context with the other provisions. Taken literally, paragraph 4's requirement that "[p]rovisional ballots cast at the wrong polling place shall not be counted" would totally negate the provisional balloting procedure set forth in the first three paragraphs of section 115.430. Such an illogical result is not compatible with established statutory construction. This Court finds that this paragraph's reference to the "wrong polling place" must be construed to be a polling place that is "wrong" after giving effect to the provisional voting rights set forth in the first three paragraphs of the same section. In other words, a provisional ballot cast in accordance with the provisions of paragraphs 1, 2, and 3 of section 115.430 will be considered to have been cast at the right polling place. Such a construction gives effect to all the provisions of section 115.430 and avoids direct conflict with the federal statute. A purely literal reading of paragraph 4—that is interpreting the "wrong" polling place to be any polling place other than the precinct in which the voter resides—would be an incorrect application of the law.

*Id.*, slip op. at 20.

This Court agrees that although state election officials may enforce a precinct-based voting system, they may not do so in a manner that abridges the right of a voter to have counted the votes for federal offices on a provisional ballot cast in the voter's proper jurisdiction once voter eligibility is verified. The defendants' directives of June 10, 2004 and October 7, 2004 prohibiting the tabulation of all out-of-precinct provisional ballots, if enforced, would abridge that right, which is enforceable under 42 U.S.C. § 1983, and the Court finds, therefore, that the plaintiffs have established a likelihood of success on the merits of their claim.

### 3. The Identification Requirements.

■ The NAACP, ACORN, and Project Vote contend in addition that the identification requirements prescribed by the defendants contradict HAVA and contravene their constitutional rights. The essence of their argument is that the State will require forms of identification for first-time voters who register by mail and appear in-person at the polls that are more onerous than federal law requires. However, those arguments were made before these plaintiffs had seen the defendants' revised directive issued on October 7, 2004. The revision allows such first-time voters to furnish the requisite identification either at the polls *or during the six-day period thereafter* when provisional ballots are being evaluated. The forms of identification are precisely those required by HAVA. *See* 42 U.S.C. § 15483(b)(2)(A)(i); Mich. Comp. Laws § 168.509t (incorporating Section 303 of HAVA). In other words, if a first-time voter who registered by mail cannot comply with Section 303(b)(2)(A)(i)'s requirement at the polls on election day, that person may cast a provisional ballot, which will be tabulated if the person can furnish the requisite identification within six days thereafter.

██ Congress intended to allow the States considerable flexibility in satisfying these requirements. *See* 42 U.S.C. § 15485 (stating that "[t]he specific choice of methods of complying with the requirements of this subchapter shall be left to the discretion of the state"). The Court finds that the defendants' directive of October 7, 2004 is consistent with both federal and State law on the subject.

██ Nor does the Court find that the statute or the defendants' directives abridge the plaintiffs' rights under the First or Fourteenth Amendments. The new State law adopts HAVA's identification requirements. The directive applies state law and provides a six-day window of opportunity for voter verification and compliance. As a rule, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

The State has an important interest in regulating elections to prevent fraud, and the rudimentary requirements of identifying voters who have never been to the polls or appeared in-person before an election official or registrar are reasonable. *See Storer*, 415 U.S. at 730, 94 S.Ct. 1274. The plaintiffs have not shown that the regulations are discriminatory or are likely to be applied unevenly. Nor have the plaintiffs complained that the identification requirements prescribed by HAVA, after which the State statute was modeled, are unconstitutional. The Court concludes, therefore, that the NAACP, ACORN and Project Vote have not established a likelihood of success on the merits of this claim.

## B. Irreparable Injury.

██ In a democracy, the right to vote is fundamental. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533–55, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *see also United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct. 1031, 85 L.Ed. 1368(1941) (observing that "[o]bviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted"); *United States v. Mosley*, 238 U.S. 383, 386, 35 S.Ct. 904, 59 L.Ed. 1355 (1915) (stating that it is "unquestionable that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box"); *Mixon v. State of Ohio*, 193 F.3d 389, 403 (6th Cir. 1999) (recognizing that "implicit in our constitutional system, a right to participate in state elections on an equal basis with other qualified voters") (quoting *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 35 n. 78, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)).

██ Although the defendants were reluctant to acknowledge at the hearing that the deprivation of an eligible voter's right to have his or her vote counted constitutes irreparable harm, this Court has no trouble so concluding. *See Bush v. Gore*, 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (observing that "having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's

vote over that of another"). The defendants' argument to the contrary is circular. They say that irreparable harm will not result because voters may always vote provisionally in the correct precinct, and the defendants' precinct-based interpretation of HAVA is legally correct. They reason, therefore, that there is no right to vote provisionally by jurisdiction and thus no right, fundamental or otherwise, will be denied. The Court has found, however, that HAVA confers a right to an eligible voter to cast a provisional ballot out of precinct and to have that ballot counted for the federal offices for which the person is eligible to vote in the jurisdiction. If that right is denied, the defendants offer no alternative means of vindicating it absent an injunction. The Court finds, therefore, that the plaintiffs would suffer an irreparable injury.

### C. Substantial Harm to Others.

■ The defendants argue that an injunction that allows out-of-precinct provisional voting would result in manifold difficulties in election administration, as well as more pernicious harm that would result in vote dilution. These concerns were expressed as well by amici curiae Walsh, Krueger, Coburn, Vedder, and Mosier. The Court does not take these claims lightly, however these problems can be minimized and they do not outweigh the other factors in favor of equitable relief.

The vote dilution claim arises from the contention that many jurisdictions in Michigan contain more than one Congressional district, and that inter-city and —township district boundaries are delineated by precinct. Likewise, local legislative districts, such as county commissioner or state legislative districts, may transect municipal boundaries. A resident of a city, village or township that is allowed to vote provisionally out of precinct may mark a ballot for an office for which he or she is not entitled to vote and thereby dilute the votes of those eligible to vote for those candidates and offices.

The Court's injunction, however, will not require that result. The right granted by HAVA is to vote only for those federal offices for "which the individual is eligible to vote." 42 U.S.C. § 15482(a). In Michigan, Congressional districts are determined by geographic boundaries, and a person is eligible to vote for the United States Representative only in the district in which the voter resides. *See generally Wesberry v. Sanders*, 376 U.S. 1, 7–8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The district of residence can be ascertained by the voter information on the provisional ballot envelope, and votes case for a Congressional seat that is outside of the voter's district need not be tabulated. Likewise, since HAVA applies only to federal elections, the votes for state and local offices and initiatives on out-of-precinct provisional ballots need not be tabulated either.

The defendants also express concern that an injunction that compels the counting of out-of-precinct provisional ballots will undermine Michigan's precinct-based voting system. However, election officials are still authorized—indeed compelled—to direct a voter to his or her correct precinct on election day. *See* Mich. Comp. Laws § 168.523a(1)(b). Moreover, the Court believes that the prospect of having one's entire ballot counted, not just the votes for federal offices, provides a strong incentive to vote in the correct precinct of one's residence.

The defendants also warn that allowing out-of-precinct provisional voting will increase the likelihood of voter fraud. They describe the specter of hoards of voters bussed in to foreign precincts overwhelming the capacity of local election officials,

causing long poll lines, and discouraging voters from casting votes in their own precincts. The Court believes that these particular concerns are overstated. Preventing election fraud and preserving the "purity of the ballot box" certainly is a legitimate State interest. *See Dunn v. Blumstein,* 405 U.S. 330, 345, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). However, Michigan enjoys an election history that is relatively fraud-free. In 1997, Michigan's attorney general stated that "as the chief law enforcement official of the State of Michigan, I am not aware of any substantial voter fraud in Michigan's elections. I have not received complaints regarding voter fraud. Moreover, the state's chief elections official, Secretary of State Candice Miller, confirmed the fact that Michigan does not have a voter fraud problem when she stated: 'We have no real evidence of voter fraud in Michigan. Michigan has historically had very clean elections.'" Mich. Op. Atty. Gen. No. 6930, 1997 WL 37560, at *3 (Jan. 29, 1997). The defendants have offered no evidence that circumstances have changed.

Director Thomas acknowledged in his testimony that he was not aware of any threat to compromise the integrity of the polls at the upcoming general election or to bus voters to the wrong precincts. Moreover, the State retains the ability to prosecute and "person [who] shall [ ] procure, aid, or counsel another person to go or come into a township, ward, or voting precinct for the purpose of voting at an election," or who "offer[s] to vote or attempt[s] to vote more than once at the same election either in the same or in another voting precinct." Mich. Comp. Laws § 168.932a(d), (e).

The defendants have stated that changing the elections rules and amending the directive to local election officials will occasion several administrative burdens since new rules would have to drafted and training conducted. The plaintiffs make shortshrift of this argument and contend that it will cost nothing for defendants to count provisional ballots. The Court rejects the plaintiffs' position. The general election is now weeks away. Election officials have undergone much of their training. That training has not included provisional voting by jurisdiction. Election officials will need to be informed how to deal with those ballots that contain votes for offices and representatives for which provisional voters in the right jurisdiction but wrong precinct would not be eligible to vote. The Court is mindful that with over 500 precincts state wide, disseminating this information this change is no small task.

However, requiring the tabulation of provisional ballots as required by the Court's preliminary injunction will have little effect at the precinct level. State law, and the defendants' directives, now provide for the evaluation and tabulation of provisional ballots at the jurisdictional (municipal) level. Director Thomas had no data that the incidence of provisional voting was large or unwieldy during the August 2004 primary election. He stated in his affidavit that only twenty percent of the 26,000 first-time mail registered voters did not submit the identification required by HAVA with their registration, so approximately 5,500 of them will be required to furnish identification on election day. It is reasonable to assume that only a fraction of those voters will not produce the requisite identification and will cast provisional ballots, which when spread across the State will result in a manageable number.

Moreover, one salient feature of provisional balloting is that they do not have to be assessed on election day, but rather they can be evaluated later as time permits. Finally, Director Thomas testified

that it would be feasible, albeit it difficult, to disseminate memoranda describing new procedures to local election officials if he is notified by October 20, 2004.

The Court concludes, therefore, that potential harm to others that might result from a preliminary injunction does not outweigh the other factors.

### D. Whether the Public Interest Will Be Served by the Injunction.

 HAVA is remedial legislation that is intended reduce the incidence of uncounted. legitimate votes in federal elections. The public interest is served when citizens can look with confidence at an election process that insures that all votes cast by qualified voters are counted. *See Bush v. Gore*, 531 U.S. at 109, 121 S.Ct. 525. The Court's injunction will promote that goal. The public interest is served when a federally granted right is enforced uniformly and voters are not disenfranchised.

### IV. Conclusion.

The Court concludes that the Help America Vote Act of 2002 creates in voters in federal elections the individual right, enforceable through 42 U.S.C. Section 1983, to cast a provisional ballot for federal offices when the voter's qualifications are challenged or his or her name does not appear on the voter list for the polling place. There is also a right to have the votes for federal offices on that ballot tabulated if it is later determined that the voter is qualified to vote in the city, village or township in which the provisional ballot was cast. The defendants' directives that prohibit local election officials from counting any provisional ballot that was cast in the proper city, village or township of the voter's residence but in the incorrect precinct violates that right. The defendants' directive concerning the manner and means of identification by first-time voters

who registered to vote by mail are consistent with federal and State law.

Accordingly, it is **ORDERED** that the plaintiffs' motions for a preliminary injunction [04–10257 # dkt 4; 04–10267 dkt # 9] are **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that defendants' motions to dismiss [04–10257 dkt # 26 & 27; 04–10267 dkt # 20 & 21] are **DENIED.**

It is further **ORDERED** that the motions to intervene by Michael F. Walsh, Daniel C. Krueger, Linda S. Coburn, Janice A. Vedder, and Diane K. Mosier to intervene as parties defendants [04–10257 dkt # 12 & 20; 04–10267 dkt # 11] are **DENIED,** the Court determining that the present defendants are able to adequately protect the rights they purport to assert. It is further **ORDERED,** however, that those persons may participate as amici curiae, and the Court accepts their filings in that capacity.

It is further **ORDERED** that the defendants, Terri Lynn Land and Christopher M. Thomas, in their official capacities as Michigan secretary of state and director of elections, respectively, their agents, servants, employees, representatives, attorneys, successors in office, and those in active concert and participation with them, are hereby restrained and enjoined, during the pendency of this action, from enforcing or directing local election officials to enforce that part of their June 16, 2004 and October 7, 2004 directives that are inconsistent with the Help America Vote Act of 2002 as set forth herein, specifically from enforcing those provisions that prohibit the tabulation of provisional ballots cast by voters qualified voters whose qualification to vote in the city, village or township are later verified, for the sole reason that the

439

provisional ballot was not cast in the voters' precinct of residence.

It is further **ORDERED** that no bond is required because the defendants will not be damaged by the preliminary injunction and there is strong public interest question involved. *See Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).